**EXHIBIT 7**

STATE OF INDIANA )    IN THE KOSCIUSKO SUPERIOR COURT NO. 1
) ss:
COUNTY OF KOSCIUSKO )    CAUSE NO. 43D01-0708-CT-*670*

DePUY ORTHOPAEDICS, INC., )
)
                    Plaintiff, )
)
        v. )
)
ZIMMER, INC., DAVID FORD SR. and )
MICHAEL B. LOS, )
)
                    Defendants. )

```
F I L E D
AUG 1 4 2007
```
*Sharon Christner*
CLERK KOSCIUSKO SUPERIOR COURT I

## COMPLAINT

For its Complaint against defendants Zimmer, Inc. ("Zimmer"), David Ford Sr. ("Ford")
and Michael B. Los ("Los"), DePuy Orthopaedics, Inc. ("DePuy") states as follows:

### NATURE OF THE ACTION

1.      This dispute involves the breach by two former DePuy employees of their fiduciary and
contractual duties to promote the interests of DePuy while employed by DePuy, not to
compete with DePuy for a defined term after their departure from DePuy, and not to
engage in employee raiding.   The dispute involves Zimmer because Zimmer has
knowingly, willfully and maliciously induced DePuy employees, including Ford and Los,
to breach their fiduciary and contractual duties to DePuy.   Zimmer has further induced
these employees to directly and indirectly encourage independent sales representatives
with contractual obligations to DePuy to breach their contractual obligations toward
DePuy and enter into new contractual relationships with Zimmer.   DePuy seeks an order:
(a) enjoining Ford and Los from breaching or continuing any conduct constituting a
breach of their contractual and fiduciary obligations to DePuy and from tortiously
interfering with the contractual and business relationships of DePuy; and (b) enjoining

Zimmer from directly or indirectly tortiously interfering with the contractual and business relationships of DePuy. DePuy also seeks an award of permanent injunctive relief and damages from Ford and Los resulting from their breaches of contract, breaches of fiduciary duty and tortious interference, and an award of permanent injunctive relief and damages from Zimmer for its tortious interference with the contracts and business relationships of DePuy.

## THE PARTIES

2.    DePuy is an Indiana corporation with its principal place of business in Warsaw, Indiana.

3.    Zimmer is an Indiana corporation with its principal place of business in Warsaw, Indiana.

4.    Ford is a resident and citizen of Mississippi.

5.    Los is a resident and citizen of Indiana.

6.    This Court has personal jurisdiction over each of the defendants.

7.    Venue is proper in this Court.

## THE BUSINESS OF DEPUY

8.    DePuy is engaged in the business of manufacturing, selling and distributing orthopedic products and instruments.

9.    DePuy promotes the distribution and sale of its orthopedic products through independent contractor sales representatives known as "sales reps."

10.   Some of these sales reps are responsible for significant geographical territories and supervise other representatives. These independent sales representatives are known as "Distributor." Other sales reps and geographical territories are supervised by a DePuy employee known as a Territory General Manager or "TGM."

11.   DePuy devotes significant resources to the training, development and retention of its sales force.

12.  In addition, DePuy's TGM's are exposed to confidential information of DePuy, including, without limitation and for example, compensation packages being received by current sales representatives, information concerning performance of existing sales representatives, and plans to reassign sales representatives to new or different accounts.

13.  Members of DePuy's sales force are the individuals with the most frequent contact with DePuy's customers. As such, members of the sales force are integral to the development and maintenance of good will between DePuy and its customers.

14.  In order to protect its investment in its sales force, and the good will developed by that sales force on behalf of DePuy, DePuy requires that the Distributors, TGMs and independent sales representatives reporting to TGMs execute agreements with DePuy.

15.  Most of these agreements contain covenants not to compete.

## THE RELATIONSHIP BETWEEN DEPUY AND FORD

16.  Ford began working for DePuy or its predecessors in interest several years ago.

17.  In 2001, Ford was employed as a DePuy Territory General Manager in a territory including Mississippi and portions of Tennessee and Alabama.

18.  On January 31, 2001, Ford signed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement (the "Ford Agreement"), a complete and accurate copy of which is attached to this Verified Complaint as Exhibit A. That Ford Agreement provides, *inter alia:*

I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture

3

upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

19.   In addition, the Ford Agreement contains the following covenant not to compete and not to solicit DePuy employees on behalf of competitors:

> I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any services to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

20.   In addition to the Ford Agreement, Ford was subject to the terms and provisions of all DePuy policies and procedures.

21.   As part of his job as TGM, Ford supervised the DePuy office located in Jackson, Mississippi and was responsible for driving sales in the territory assigned to him.

22.   Although located in Jackson, Mississippi, in order to do his job Ford had routine communications with DePuy's Warsaw, Indiana headquarters and visited those headquarters many times in any given year.

23.   Although the number varied over time, Ford was responsible for supervising seven to ten sales representatives who reported to him.

4

24.    As TGM, Ford was responsible for setting the compensation of these sales representatives, assessing sales representative performance, and for reassigning sales representatives to new or revised territories.

25.    The precise compensation of various sales representatives, their current level of performance, and decisions as to whether these sales representatives were to be reassigned to new or revised territories, were not generally known outside of DePuy.

26.    DePuy took appropriate steps to maintain the confidentiality of this information.

27.    DePuy derives economic benefit from this information not being generally known to the orthopedics industry.

28.    Ford announced his resignation from DePuy on April 5, 2007.

29.    Ford has announced his intent to take a position with Zimmer, though he has failed to identify that position, its responsibilities or the location from which he will operate.

## THE RELATIONSHIP BETWEEN DEPUY AND LOS

30.    Los began working for DePuy or its predecessors many years ago.

31.    In 2001, Los was employed as a DePuy Territory General Manager.

32.    On January 21, 2001, Los signed a Non-Solicitation Agreement (the "Los Agreement"), a complete and accurate copy of which is attached to this Verified Complaint as Exhibit B. That Los Agreement contains provisions similar to those contained in the Ford Agreement relating to the treatment of DePuy confidential information, and an employee's obligations concerning non-competition and solicitation of DePuy employees after departure from DePuy. See Los Agreement at ¶¶ 5, 7.

33.    In addition to the Los Agreement, Los was subject to the terms and provisions of all DePuy policies and procedures.

34.    As part of his job as TGM, Los supervised a DePuy office located in Indiana and was responsible for driving sales in the territory assigned to him, which included portions of Indiana and Michigan.

35.    Although the number varied over time, Los was responsible for supervising several sales representatives who reported to him.

36.    As TGM, Los was responsible for setting the compensation of these sales representatives, assessing sales representative performance, and for reassigning sales representatives to new or revised territories.

37.    The precise compensation of various sales representatives, their current level of performance, and decisions as to whether these sales representatives were to be reassigned to new or revised territories, were not known outside of DePuy.

38.    DePuy took appropriate steps to maintain the confidentiality of this information.

39.    DePuy derives economic benefit from this information not being generally known to the orthopedics industry.

40.    Los announced his resignation from DePuy on April 5, 2007.

41.    Los has announced his intent to take a position with Zimmer, though he has failed to identify that position, its responsibilities or the location from which he will operate.

**FACTS LEADING TO THE CURRENT DISPUTE**

42.    Zimmer is engaged in the business of manufacturing, selling and distributing orthopedic products and instruments.

43.    Zimmer is a competitor of DePuy.

44.    Recently, Zimmer has engaged in a concerted effort to solicit employees involved in DePuy's sales management to leave DePuy.

45.    As a result of these efforts, Ford and Los have left DePuy.

46.   Zimmer is aware and has been informed that Ford and Los have contracts with DePuy, and has been provided with copies of those contracts.

47.   Zimmer is also aware of the fiduciary obligations of Ford and Los to DePuy.

48.   Despite knowledge of these obligations, Zimmer has caused Ford and Los to breach their fiduciary and contractual obligations to DePuy.

49.   For example, in March 2007, while Ford was employed as a DePuy TGM, Zimmer induced Ford to contact DePuy sales representatives reporting to Ford and solicit those sales representatives on behalf of Zimmer.

50.   On information and belief, Zimmer also induced Ford to disclose confidential information to Zimmer about these sales representatives, including their compensation history and details of their performance evaluations, and Ford did in fact disclose that confidential information to Zimmer.

51.   Zimmer also induced Ford to schedule meetings with the sales representatives and representatives of Zimmer, including its President, Jon Kramer, and its Vice President of Sales, Chris Christea, at which the DePuy Sales Representatives were solicited by Zimmer.

52.   Ford attended and took part in these meetings with the DePuy sales representatives.

53.   Ford then sent out Zimmer offers to at least one of the DePuy sales representatives while Ford was employed by DePuy.

54.   After his departure from DePuy in April 2007, Ford continued to contact DePuy sales representatives whom he had supervised and solicit them on behalf of Zimmer.

55. As a result of these wrongful actions on the part of Ford and Zimmer, DePuy has been forced to renegotiate agreements with sales representatives in the territory formerly administered by Ford.

56. Upon information and belief, Zimmer has engaged in similar acts of tortious interference with Los.

57. In addition, Zimmer has induced Los to engage in the solicitation of employees of DePuy, and Los has in fact solicited employees of DePuy on behalf of Zimmer in violation of Los's contractual and fiduciary duties to DePuy.

58. Zimmer has also solicited, directly and indirectly through Ford and Los, sales representatives and DePuy Distributors who have term agreements with DePuy to breach those agreements and to begin working for Zimmer.

59. Zimmer has been informed that some or all of these sales representatives and Distributors have term agreements, preventing them from terminating their relationships with DePuy at will.

60. Despite this information, Zimmer has persisted in soliciting these sales representatives and distributors to leave DePuy before the end of the sales representatives' or Distributors' term agreements.

61. These wrongful actions on the part of Zimmer have caused DePuy sales representatives and Distributors to breach their agreements with DePuy and demand new agreements containing terms that are more favorable to the sales representatives or Distributors than the terms contained in their existing agreements.

62. These actions have caused DePuy harm by, among other things, causing DePuy to incur additional expenses to retain sales representatives and Distributors who were already

under contract with DePuy at terms more favorable to the sales representatives and Distributors.

63.    The actions of Zimmer, Ford and Los have harmed DePuy.

64.    DePuy has suffered and continues to suffer severe and irreparable harm as a result of defendants' acts, including but not limited to loss of goodwill and business relationships.

65.    DePuy has no adequate remedy at law that will fully compensate DePuy for its injury and harm.

**COUNT I**
**BREACH OF CONTRACT**
**(Directed to Ford and Los)**

66.    DePuy incorporates by reference, as though fully stated herein, paragraphs 1 through 65 of its Complaint.

67.    The Ford Agreement and Los Agreement are valid, binding and enforceable contracts between DePuy and those defendants.

68.    DePuy has performed all conditions required by it under the Agreements or all such conditions have been waived or excused.

69.    Ford and Los have materially breached their Agreements by, among other things, rendering services to Zimmer while employed by DePuy and by breaching their non-competition and non-solicitation obligations to DePuy.

70.    DePuy has suffered and continues to suffer severe and irreparable harm as a result of Ford and Los's breaches of their Agreements, and has no adequate remedy at law that will fully compensate DePuy for its injury and harm.

**COUNT II**
**BREACH OF DUTIES OWED TO DePUY**
**(Directed to Ford and Los)**

71.    DePuy incorporates by reference, as though fully stated herein, paragraphs 1 through 65 of its Complaint.

72.    As employees of DePuy with management responsibilities, Ford and Los owed duties, while employed by DePuy, to pursue the best interests of DePuy and to promote the business, products and services of DePuy only.

73.    In addition, Ford and Los owed a duty, while employed by DePuy and thereafter, to protect the confidential information of DePuy and not to use that information for their own benefit or for the benefit of a third party.

74.    Ford and Los have breached their obligations to DePuy.

75.    DePuy has suffered and continues to suffer severe and irreparable harm as a result of Ford and Los's breaches of their duties of loyalty, including but not limited to loss of goodwill and business relationships, resulting in DePuy having no adequate remedy at law that will fully compensate DePuy for its injury and harm.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**AND BUSINESS RELATIONSHIPS**
**(Directed to Ford and Los)**

76.    DePuy incorporates by reference, as though fully stated herein, paragraphs 1 through 65 of its Complaint.

77.    DePuy has valid, binding contracts between itself, its employees and its independent contractors engaged in the promotion and sale of orthopedic products.

78.    In addition, DePuy has ongoing business relationships between itself and its customers with the expectation that those business relationships will continue.

10

79.   Ford and Los are aware of these contracts and business relationships.

80.   Ford and Los have interfered with these contacts and business relationships.

81.   Ford and Los have acted illegally in their interference with these business relationships.

82.   Ford and Los's actions are not justified.

83.   DePuy has suffered and continues to suffer severe and irreparable harm as a result of Ford and Los's actions, resulting in DePuy having no adequate remedy at law that will fully compensate DePuy for its injury and harm.

## COUNT IV
## UNFAIR COMPETITION
### (Directed to Ford and Los)

84.   DePuy incorporates by reference, as though fully stated herein, paragraphs 1 through 65 of its Complaint.

85.   Ford and Los have unfairly competed with DePuy by, among other things, taking the goodwill, trade secrets and other confidential commercial information of DePuy and agreeing and attempting to transfer that goodwill, trade secrets and other confidential commercial information to themselves and/or Zimmer.

86.   DePuy has suffered and continues to suffer severe and irreparable harm as a result of Ford and Los's acts of unfair competition, including but not limited to loss of goodwill and business relationships, resulting in DePuy having no adequate remedy at law that will fully compensate DePuy for its injury and harm.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
## AND BUSINESS RELATIONSHIPS
### (Directed to Zimmer)

87.   DePuy incorporates by reference, as though fully stated herein, paragraphs 1 through 65 of its Complaint.

11

88.    DePuy has valid, binding contracts between itself, its employees and its independent contractors engaged in the promotion and sale of orthopedic products, including but not limited to Ford and Los.

89.    In addition, DePuy has ongoing business relationships between itself and its customers with the expectation that those business relationships will continue.

90.    Zimmer is aware of these contracts and business relationships.

91.    Zimmer has interfered with these contacts and business relationships.

92.    Zimmer has acted illegally in its interference with these business relationships.

93.    Zimmer's actions are not justified.

94.    DePuy has suffered and continues to suffer severe and irreparable harm as a result of Zimmer's actions, resulting in DePuy having no adequate remedy at law that will fully compensate DePuy for its injury and harm.


WHEREFORE, DePuy requests the following relief:

1.    An order preliminarily and permanently enjoining Ford and Los, and any party acting in concert or participation with them, from directly or indirectly contacting or soliciting any DePuy employee or independent contractor until April 19, 2008, or such other date as may be ordered by the Court;

2.    An order preliminarily and permanently enjoining Ford and Los, and any party acting in concert or participation with them, from soliciting any business from, selling to, or rendering any services to, or, directly or indirectly, helping others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom Ford or Los had contact during the last twelve (12) months of their employment with DePuy, for any purpose

12

related to the sale of any such product or service, until October 19, 2008, or such other date as may be ordered by the Court;

      3.     An order preliminarily and permanently enjoining Ford and Los, and any party acting in concert or participation with them, from using or misappropriating the confidential information and trade secrets of DePuy;

      4.     An order preliminarily and permanently enjoining Zimmer, and any party acting in concert or participation with it, from interfering with Ford and Los in the performance of their respective fiduciary and contractual duties to DePuy;

      5.     An order preliminarily and permanently enjoining Zimmer, and any party acting in concert or participation with it, from interfering in the contracts or business relationships of DePuy, including but not limited to interference with term agreements between DePuy, its distributors and its independent contractors;

      6.     An award of monetary and punitive damages to DePuy; and

      7.     All other just and proper relief.

Respectfully submitted,

Dwight D. Lueck
Kendall Millard
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313

Gary C. Furst
BARNES & THORNBURG LLP
600 One Summit Square
Ft. Wayne, Indiana 46802
Telephone: (260) 425-4669

13

Attorneys for Plaintiff,
DePuy Orthopaedics, Inc.

14

# EXHIBIT A



## EMPLOYEE SECRECY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee:     Michael B. Los                    DePuy Orthopaedics, Inc.
Residence Address:    414 Mayfield Place                Post Office Box 988
                      Brentwood, TN 37027               700 Orthopaedic Drive
                                                        Warsaw, IN 46581-0988
                                                        USA
**DEFINITIONS**                                         Tel: +1 (219) 267-8143
                                                        Fax: +1 (219) 267-7196
As used in this Agreement:

**the COMPANY** means **DePuy Orthopaedics, Inc.**, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

 I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

 Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and the benefits being provided to me pursuant to paragraph 9:

1.  I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2.  I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3.  I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United

States, or any foreign country, or to protect otherwise the COMPANY's interests. The obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my gross monthly income is less than what I last received from the Company as regular monthly base pay (exclusive of extra compensation and employee benefits), then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay) shall bind me only as long as the Company shall make payment to me equal to the lesser of (a) the amount last received from the Company as regular monthly base pay, or (b) the difference between the amount I last received from the Company as regular monthly base pay and the gross monthly income that I am receiving in any subsequent employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the Company, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my gross monthly income equaled my last regular monthly base pay at the Company, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the Company may request to enable it to verify the accuracy of my representation. I understand that the Company shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the Company gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular

- 2 -

Revised 8/27/99

monthly base pay at the Company, as case may be, then, the Company will no longer obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the Company elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the Company may request. The Company will be obligated to pay me my full base salary during the notice period, and my duty of loyalty to the Company shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 1/24/01

EMPLOYEE SIGNATURE

Michael B. Los
414 Mayfield Place
Brentwood, TN 37027

Revised 8/27/99

# EXHIBIT B

**DePuy**

a Johnson-Johnson company

## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

**DePuy Orthopaedics, Inc.**

Name of Employee:        David Ford Sr.
Residence Address:       292 Surrey Crossing
                         Ridgeland, MS  39157

PO Box 988
700 Orthopaedic Drive
Warsaw, Indiana 46581-0988
USA

Tel: +1 (219) 267 8143
Fax:+1 (219) 267 7196

### DEFINITIONS

As used in this Agreement:

**the COMPANY** means DePuy Orthopaedics, Inc., and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future.  Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, t generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively.  I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and the benefits being provided to me pursuant to paragraph 9:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY.  I assign and agree to assign my entire right, title and interest therein to the COMPANY.  I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY.  I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests.  These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived,

authored or made by me during my pe.. .d of employment, and shall be binding upon n... executors, administrators, or other legal representatives.

4.  I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.  I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.  During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.  I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that, for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.  To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9.  If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my gross monthly income is less than what I last received from the Company as regular monthly base pay (exclusive of extra compensation and employee benefits), then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay) shall bind me only as long as the Company shall make payment to me equal to the lesser of (a) the amount last received from the Company as regular monthly base pay, or (b) the difference between the amount I last received from the Company as regular monthly base pay and the gross monthly income that I am receiving in any subsequent employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the Company, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my gross monthly income equaled my last regular monthly base pay at the Company, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the Company may request to enable it to verify the accuracy of my representation. I understand that the Company shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the Company gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the Company, as the case may be, then, the Company will no longer be obligated to make the payments that had been required due to those prohibitions.

- 2 -

Revised 6/23/00

12. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee:  Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee:  Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY.  I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the Company elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the Company may request.  The Company will be obligated to pay me my full base salary during the notice period, and my duty of loyalty to the Company shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: ___1-31-01___

David Ford Sr.
_DAVID FORD_
Name
_22 Staff Crossing_
Address
_Redbank, NJ 3757_
City/State

Revised 6/23/00