**Declaration of Tory E. Griffin in Support of Consolidation of Actions**

# EXHIBIT 10

Page 1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF INDIANA
 2                        SOUTH BEND DIVISION

 3   DePUY ORTHOPAEDICS, INC.
                                   3:07CV00425
 4        vs.

 5   GAULT SOUTH BAY, INC.,        South Bend, Indiana
     ROBERT GAULT,                 September 17, 2007
 6

 7

 8                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ROBERT L. MILLER, JR.
 9

10   APPEARANCES:

11   FOR PLAINTIFF:        DWIGHT D. LUECK
                           Barnes & Thornburg
12                         11 South Meridian Street, Suite 1313
                           Indianapolis, Indiana 46204-3535
13
     FOR DEFENDANTS:       WILLIAM N. HOWARD
14                         Freeborn & Peters
                           311 South Wacker Drive, Suite 3000
15                         Chicago, Illinois 60606

16                         ROBERT PALMER
                           May, Oberfell & Lorber
17                         4100 Edison Lakes Parkway, Suite 100
                           Mishawaka, Indiana 46545
18

19                      DEBRA J. BONK, RMR, CRR
                      Federal Official Court Reporter
20                     United States District Court
                      204 South Main Street - Room 323
21                       South Bend, Indiana 46601

22

23   Proceedings reported in machine shorthand.  Transcript
     produced by Computer-Aided Transcription - ECLIPSE
24

25
```

```
 1                          INDEX

 2   PLAINTIFF'S WITNESS:

 3   BRADFORD C. LaPOINT
```

```
 4   Direct Examination by Mr Lueck.............Page   8

 5   Cross Examination by Mr. Howard...........Page 33

 6   Redirect Examination by Mr. Lueck.........Page 39

 7   Recross Examination by Mr. Howard.........Page 40
```

```
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good afternoon.

 2              This is Civil Cause 07-25, DePuy Orthopaedics versus

 3    Gault South Bay and Robert Gault, and we are gathered for

 4    hearing on the Plaintiff's motion for temporary injunction.

 5              Help me with the pronunciation, Mr. Lueck.

 6              MR. LUECK:  "Lueck," actually.

 7              THE COURT:  "Lueck," okay.

 8              MR. LUECK:  Yes, Your Honor.

 9              THE COURT:  And, Mr. Palmer, I see you are

10    accompanied, but I show you as the only attorney who has

11    appeared.

12              MR. PALMER:  Yes, Your Honor.  This is

13    William Howard from Chicago.

14              MR. HOWARD:  Good afternoon, Your Honor.

15              MR. PALMER:  His motion for pro hac is on his way

16    from his office to my office.  He has been admitted in

17    another case before this Court.

18              THE COURT:  Okay.  Did either side wish -- I have

19    read -- I would tell you I have read your submissions and

20    the evidentiary material attached to the submissions.

21              I understand that Judge Ware, on Friday, decided to

22    wait and see what happens here.

23              Did either side intend to present additional

24    evidence?

25              Mr. Lueck, anything for the Plaintiff?
```

Page 4

```
 1           MR. LUECK:  Yes, Your Honor.

 2           We were expecting to introduce evidence through two

 3   witnesses, one Bob Gault, the Defendant; the second, Brad

 4   LaPoint, who is our client representative for DePuy.

 5           The subpoena was served on Mr. Gault's counsel, who

 6   declined to accept, his California counsel.  I believe it

 7   has been served on him personally, but I cannot at this

 8   point confirm that.

 9           In any event, Mr. Gault is not here today, and I've

10   been told will not be here today.

11           I do have Mr. LaPoint.  And in light of comments

12   that counsel for Gault made regarding allegations of hearsay

13   evidence, I would like to have Mr. LaPoint take the stand

14   for about 10 to 15 minutes.

15           THE COURT:  Did the Defense intend to present

16   witnesses?

17           MR. PALMER:  Your Honor, we intend to present no

18   additional evidence.

19           However, we do have a preliminary issue of personal

20   jurisdiction over Mr. Gault, and Mr. Howard would like to

21   argue.

22           MR. HOWARD:  Thank you, Your Honor.

23           And just by way of housekeeping, there was a

24   pleading filed on behalf of my clients, and it was the

25   motion to dismiss or in the alternative to stay.
```

1          THE COURT:  I have read that.

2          MR. HOWARD:  Very well.

3          With respect to the issue of the subpoena on

4     Mr. Gault, there's a couple of issues.  The first is --

5          THE COURT:  I understand it they're not trying to

6     enforce it, so I'm not --

7          MR. HOWARD:  Well, I understand.  But it was also

8     issued out of the California court, and there's a question

9     as to whether, even if Mr. Gault was served -- and my

10    information this morning, he has not been served -- there

11    would be some question as to the priority or validity of

12    that subpoena.

13         THE COURT:  What will you be asking me to decide

14    here because I gather they're not asking me to enforce it?

15         MR. HOWARD:  I understand, but I mention it because

16    there's an issue with respect to jurisdiction over Mr. Gault

17    himself personally.

18         Mr. Gault is a resident of California, a citizen of

19    California.  His business is conducted in California.

20         In Paragraph 4 of the Plaintiff's complaint, they

21    state that as a general statement without any supporting

22    information or evidence, that the Court has jurisdiction

23    over all the parties.

24         They then refer to Paragraph 6, the venue provision,

25    and cite 1391.

1          There's a basic flaw with jurisdiction with respect

2     to Mr. Gault.  He has no connection with Indiana.  He's not

3     a party to the agreement.  He's never submitted to

4     jurisdiction in Indiana.  He's got nothing to do with

5     Indiana whatsoever.  There's no personal jurisdiction over

6     him.

7          So, therefore, any relief that Plaintiffs are

8     requesting with respect to Mr. Gault we think is misplaced

9     given the fact that there is no personal jurisdiction, not

10    even to mention the venue issues.

11         So we believe that this is - proceeding at this

12    point with respect to Mr. Gault would be improper because we

13    have not acquiesced to jurisdiction.  He's got nothing to do

14    with Indiana whatsoever.

15         And I don't know how counsel intends to address that

16    or if they can even redress it, but I think that's a

17    preliminary issue that we need to get right up front.

18         As the court is probably aware on the contract in

19    issue, there was a place for Mr. Gault to sign individually.

20    He did not do so.

21         THE COURT:  Let me propose -- since I think that

22    weaves in with several of your other arguments, as I

23    understand it, why don't we allow the evidence to proceed

24    and then let both sides argue that at the close of the

25    evidence today, because, obviously, that weaves together

1    how -- I think the same facts that you're talking about tie

2    together on both jurisdiction and the likelihood of success

3    on the merits, don't they?

4              MR. HOWARD:  Yes and no, Your Honor.

5              The reason I raise it now is because it is a

6    threshold issue as to whether there's jurisdiction over

7    Mr. Gault, and there is no basis of any kind to assert any

8    claim against him.

9              With respect to the success in the merits, clearly

10   that is one of the categories here.  But, again, we just

11   wanted to raise this up front because p.j. -- I'm sorry --

12   personal jurisdiction is a preliminary issue, and I wanted

13   to make sure that that was clear, no indication that there

14   was any connection with Indiana whatsoever here.

15             THE COURT:  Okay.  I'll show the motion being made

16   at the outset of the hearing with further argument deferred

17   until the conclusion of the hearing.

18             MR. HOWARD:  Thank you, sir.

19             THE COURT:  I think we can address it all altogether

20   a little bit better.

21             You may proceed.

22             MR. LUECK:  Thank you, Your Honor.

23             I call to the stand Brad LaPoint.

24

25

1                    BRADFORD CLARK LaPOINT,

2          called as a witness by the Plaintiff, having been first

3          duly sworn, was examined and testified as follows:

4                    DIRECT EXAMINATION

5          BY MR. LUECK:

6     Q    Good afternoon, sir.

7     A    (No response.)

8     Q    Would you, please, state your full name for the record.

9     A    Bradford Clark LaPoint.

10    Q    What is your address?

11    A    My address is 11 San Pablo Street; Novato, California;

12    94949.

13    Q    Are you employed?

14    A    I am.

15    Q    By whom?

16    A    Johnson & Johnson, DePuy Orthopaedics.

17    Q    Do you have any understanding as to where DePuy

18    Orthopaedics is located?

19    A    I do.  Warsaw, Indiana.

20    Q    How long have you worked for DePuy?

21    A    Six years.  Excuse me.  Seven years.

22    Q    What is your position today at DePuy?

23    A    Territory general manager for Northern California.

24    Q    What are the duties of that job?

25    A    Overseeing the sales and distribution for DePuy

1   Orthopaedics.

2   Q    You mentioned territory manager for Northern

3   California.   Approximately how far south in the state does

4   your territory extend?

5   A    Just past Monterey to the south and up just to Eureka

6   to the north.

7   Q    Whom do you work with?

8   A    Physicians, hospitals, and sales representatives.

9   Q    Do you communicate on a regular basis directly with the

10  physicians and hospitals?

11  A    I do.

12  Q    Are there any people in the DePuy organization below

13  you that would interface with the hospitals and surgeons?

14  A    There are.

15  Q    Who are they?

16  A    Sales representatives.

17  Q    Are you in charge of supervising sales representatives?

18  A    I am.

19  Q    How many sales representatives are you in charge of

20  supervising?

21  A    Thirty-seven.

22  Q    Are all of these sales representatives individuals?

23  A    No.   Some are organizations or groups.

24  Q    Do those organizations then have additional people who

25  represent the DePuy product?

1    A    Yes, they do.

2    Q    What does DePuy offer?

3    A    Orthopaedics products and instrumentation and training.

4    Q    Can you give some examples of the products that it

5    offers?

6    A    Primarily total hip and knee replacement, shoulder

7    replacement, most implantable orthopaedic products.

8    Q    You mentioned that you supervise sales representatives.

9    Are those sales representatives important to DePuy?

10   A    Yes, they are.

11   Q    How?

12   A    They are the face and the -- they're involved in the

13   surgical aspect, selling the product, making sure that the

14   hospital has the appropriate implants, providing that

15   service to the physicians.

16   Q    Does DePuy provide the sales representatives with any

17   materials or assistance?

18   A    Yes, literature, X-ray templates, sample products.

19   Q    You mentioned that you have a territory of Northern

20   California.

21       Are all of the hospitals in that territory assigned

22   to one DePuy sales rep or another?

23   A    Yes.  There are five different teams that we have.

24   Q    Can you define those different teams?

25   A    Yes.

1          Previously, we had Gault South Bay Orthopaedics.

2          We have B & R Orthopaedics; Eulis Haselden,

3     Incorporated; Mark Morey, Incorporated; and Mike Olmes,

4     Incorporated.

5     Q    You mentioned Gault.  Was Gault or Gault South Bay a

6     distributor or -- I'm sorry -- a sales representative for

7     some amount of time?

8     A    Yes, he was.

9     Q    Do you know when they became a sales representative?

10    A    I believe he started working for DePuy in 1997 or '98.

11    Q    Do you have any understanding of whether Mr. Gault had

12    been involved in the orthopaedics industry prior to joining

13    with DePuy?

14    A    Yes.  He was an independent representative with

15    Howmedica Orthopaedics.

16    Q    Is Howmedica a competitor of DePuy?

17    A    They are.

18    Q    Can you identify any other competitors of DePuy active

19    in Northern California?

20    A    Zimmer; Stryker; Smith, Nephew, Richards; and Biomet.

21          MR. LUECK:  May I approach the witness, Your Honor?

22          THE COURT:  You may.

23          BY MR. LUECK:

24    Q    Mr. LaPoint, I handed you what's been marked Exhibit A.

25    Can you identify that document?

Page 12

1    A    This is a standard independent contractor agreement.

2    Q    Between whom is this agreement?

3    A    Between the independent contractor and DePuy

4    Orthopaedics.  In this case, my office.

5    Q    This contract is dated November 22nd, 2006.  Do you see

6    that on the first page?

7    A    I do.

8    Q    Is that approximately the date that you understand the

9    contract to have been executed?

10   A    Yes.

11        MR. LUECK:  Move for the admission of Exhibit A.

12        THE COURT:  Any objection?

13        MR. HOWARD:  Subject to Cross Examination, if the

14   Court, please.

15        THE COURT:  Sure.  You'll be able to cross-examine

16   on all that come in.

17        Any objection to the admissibility at this point?

18        MR. HOWARD:  Not at this time.

19        THE COURT:  If something develops on Cross, you can

20   move to strike.

21        Exhibit A is admitted without objection.

22        BY MR. LUECK:

23   Q    Mr. LaPoint, I direct your attention on Exhibit A to

24   Page 10.  It's numbered Page 10.  I think it's probably the

25   eleventh page of the exhibit itself.

1    A    Okay.

2    Q    Do you see that page?  It has some signatures on it.

3    A    Yes.

4    Q    The first signature is identified as that of Bradford

5    C. LaPoint.  Is that your signature?

6    A    It is.

7    Q    And the agreed and accepted appears to be that of

8    Mr. Gault.  Do you see that?

9    A    Yes.

10   Q    Looking to the right, there's an approved signature.

11   Who signed that?

12   A    That's Bruce Cavarno, our area director for the West.

13   Q    Looking below those signature blocks, there's a

14   paragraph that starts out:  As a material inducement to

15   DePuy to enter into the foregoing agreement.  It goes on.

16   Do you see that paragraph and that signature block?

17   A    I do.

18   Q    Did you ask Mr. Gault to sign that signature block?

19   A    I did not.

20   Q    Why not?

21   A    That's intended for the subreps that work underneath

22   the main principals.  In this case, Bob Gault.

23   Q    Did you allow Mr. Gault an opportunity to review this

24   agreement in advance of asking that he sign it?

25   A    I did.

1    Q    Did you ask him to sign it?

2    A    Yes, I did.

3    Q    Did he sign it?

4    A    He did.

5    Q    I would ask you to direct your attention to the page

6    that follows the signature page, Appendix A.  Do you see

7    that page?

8    A    Yes.

9    Q    And it identifies a territory as all accounts listed

10   for Customer Number 701940.  Do you see that?

11   A    Yes.

12   Q    What do you understand Customer Number 701940 to be?

13   A    That is Bob Gault's account number with the company.

14        Each rep -- each rep group has an assigned number

15   for ordering templates and sample products and so forth, and

16   that's what that number represents, his actual number.

17   Q    What accounts do you understand to be listed for that

18   customer number?

19   A    The accounts in the South Bay territory that Bob Gault

20   represented.

21        MR. LUECK:  Your Honor, may I approach the witness?

22        THE COURT:  You may.

23        BY MR. LUECK:

24   Q    Mr. LaPoint, I've handed you what's been marked as

25   Exhibit B.

1    A    Uh-huh.

2    Q    Can you identify that exhibit?

3    A    Yes.

4    Q    What is that exhibit?

5    A    These are Bob Gault's hospital accounts that he had

6    account responsibility for.

7    Q    Is this a list of those accounts as they existed at the

8    time that Mr. Gault ceased to represent DePuy products?

9    A    Yes.

10    Q    Was this the list of accounts that existed as of the

11    date that Mr. Gault signed the agreement, Exhibit A?

12    A    Yes.

13    Q    Can you define, in general terms, the location or

14    geography where these accounts are located?

15    A    It's the Silicon Valley, Stanford, San Jose, Los Gatos

16    area of Northern California.

17    Q    Are there other accounts in that general territory or

18    that general geography that are not listed on this list,

19    Exhibit B?

20    A    Yes.

21    Q    And what do you understand those other accounts that

22    were not assigned to Bob Gault to be?

23    A    In the proximity to these, that would be Santa Cruz,

24    Santa Clara, South San Francisco, Fremont, and Hayward.

25    Q    Do you know whether Mr. Gault, Gault South Bay,

1   represented these accounts prior to the execution of the

2   agreement, Exhibit A?

3   A     Yes, he did.

4   Q     Did Mr. Gault voice any objections to signing Exhibit

5   A?

6   A     He did not.

7   Q     Did he indicate to you whether he had sought legal

8   counsel before signing the exhibit?

9   A     He did not.

10           MR. HOWARD:  Objection, Your Honor.  I would move to

11  strike.  There's no evidence that Mr. Gault has signed

12  Exhibit A in his individual capacity.

13           THE COURT:  I don't think the question called for

14  specificity.

15           I understand the Defendants' position on that.

16           MR. HOWARD:  Thank you, Your Honor.

17           THE COURT:  I think the question is whether he

18  voiced any objection before signing it.  And as I understand

19  it, there's no issue as to whether he signed it, just the

20  capacity.

21           MR. HOWARD:  Yes, sir.  Thank you.

22           THE COURT:  So the objection is overruled.

23           MR. LUECK:  May I approach the witness, Your Honor?

24           THE COURT:  You may.

25        BY MR. LUECK:

1    Q    Mr. LaPoint, I've handed you what's been marked Exhibit

2    C.  Can you identify that document?

3    A    Yes.

4    Q    What is it?

5             THE COURT:  I think the question is what it is, sir.

6             THE WITNESS:  Oh, I'm sorry.

7    A    This is an addendum to his previous agreement, and the

8    addendum stated, in Areas 1 and 2, our modifications to the

9    previous contract that he had.

10            BY MR. LUECK:

11   Q    Is the previous contract that you're referring to

12   Exhibit A?

13   A    Correct.

14   Q    So this is an addendum to Exhibit A?

15   A    Correct.

16   Q    Are you aware of any other addendums, addenda, or

17   amendments to Exhibit A aside from this Exhibit C?

18   A    Not during this contract period.

19            MR. LUECK:  Move to admit Exhibit C.

20            THE COURT:  Any objection to Exhibit C?

21            MR. HOWARD:  Not at this time, Your Honor.

22            THE COURT:  Without objection, Exhibit C is admitted

23   into evidence.

24

25

1    BY MR. LUECK:

2    Q    Mr. LaPoint, is that your signature on Exhibit C?

3    A    Yes, it is.

4    Q    And do you see directly below you is a signature.  Can

5    you identify that signature?

6    A    That's Robert Gault's.

7    Q    And below that is, it looks like, a printed name.  Can

8    you read that printed name?

9    A    Robert G. Gault.

10   Q    Do you see any reference beside that printed name,

11   Robert G Gault, to president or sole shareholder or any

12   other limitation?

13   A    I do not.

14   Q    Did Mr. Gault raise with you an issue of whether he

15   should be signing this as Robert Gault or as Robert Gault,

16   president of Gault South Bay?

17   A    He did not.

18   Q    Was it an issue?

19   A    No, it was not.

20   Q    Approximately how many years did Mr. Gault represent

21   DePuy products?

22   A    Ten, 10 to 11.

23   Q    Are you aware of whether in that time he visited

24   Indiana at any time?

25   A    Yes, I believe he did.

1          MR. HOWARD:  Objection.  Lack of foundation, Your

2     Honor.

3          THE COURT:  Well, I'll allow the question as to

4     whether he's aware and then follow up to show a foundation,

5     so I'll allow the question.

6          BY MR. LUECK:

7     Q    You said that you believe you are.  What basis do you

8     have for having any understanding of what Mr. Gault did

9     during his time at DePuy?

10    A    I believe he went with surgeon customers back to do

11    what we call a plant tour.  He went and saw the facility,

12    showed the physicians how we make products.

13    Q    And where is the plant located?

14    A    Warsaw, Indiana.

15    Q    Do you know how many times Mr. Gault came to Warsaw,

16    Indiana on a plant tour?

17    A    I do not.

18    Q    Are you aware of any other visits that Mr. Gault made

19    to Indiana?

20    A    I am aware of a trip to visit Biomet.

21    Q    Who's Biomet?

22    A    Biomet's a competitor to DePuy Orthopaedics.

23    Q    What basis do you have for believing that Mr. Gault

24    made a trip to Biomet?

25    A    I was told by --

1          MR. HOWARD:  Objection, Your Honor.  It calls for

2    hearsay unless it's Mr. Gault himself.

3          THE COURT:  I think the hearsay part's already out.

4    Let me hear where he got it, and then I'll entertain a

5    motion to strike.

6          You were told by whom?

7          THE WITNESS:  Told by physician customers and other

8    sales representatives.

9          THE COURT:  Do you move to strike?

10         MR. HOWARD:  I'd move to strike, Your Honor.

11         THE COURT:  Your response?

12         MR. LUECK:  Your Honor, this is a temporary

13   restraining order hearing.  It is appropriate at this point

14   to relax the rules on evidence, taking into account, of

15   course, that because those rules are relaxed, some evidence

16   may have more weight than others, but I believe it is

17   appropriate for Mr. LaPoint to identify his understanding

18   and for the Court to consider it for what it's worth.

19         THE COURT:  I think we're probably now at the

20   intersection of the -- what I had indicated before.  I

21   thought there would be a substantial overlap between the

22   facts, as far as Mr. Gault's relationship to the agreement,

23   and the jurisdiction argument that was raised before.

24         I understand your argument goes to that first point.

25   How do you respond to the extent this evidence would be

1   considered on the personal jurisdiction issue?

2            MR. LUECK:  Well, Your Honor, I believe that, to the

3   extent that the evidence is admissible, it would be directly

4   attributable and usable in the jurisdictional issue, so

5   certainly the testimony that just took place regarding

6   visits to Warsaw would be relevant as to the DePuy visits.

7            This issue, at this point, may not be admissible on

8   the jurisdiction point but would be admissible, I believe,

9   on the issue of whether a temporary restraining order is in

10  place.

11           THE COURT:  So you're offering it only on the TRO

12  then rather than on the --

13           MR. LUECK:  As to the visit to Biomet, yes.

14           THE COURT:  The objection is overruled,

15  understanding it's admitted for the limited purpose of

16  dealing with the TRO rather than personal jurisdiction

17  issue.

18           Again, I think it would go to the weight,

19  understanding that in TROs we all have to move a little

20  faster than we can normally marshal evidence.

21           MR. LUECK:  Thank you, Your Honor.

22  Q    Mr. LaPoint, what is the basis for your understanding

23  that Mr. Gault visited Indiana in connection with Biomet?

24  A    My understanding was to go back and strike a

25  relationship in a contractual sense.

1   Q    What is that understanding based on?

2   A    The fact that he is now working for Biomet.

3   Q    Have you spoken with anyone regarding the basis for

4   that understanding?

5        MR. HOWARD:  Objection, Your Honor.  Again, asking

6   for a hearsay response.  Before the cow is out of the barn,

7   I would like to address that.

8        THE COURT:  All of these questions with respect to

9   the Biomet trip, were all of those offered for the limited

10  purpose then of the TRO?

11       MR. LUECK:  Yes, Your Honor.

12       THE COURT:  I'll view the evidence as far as the

13  Biomet trip solely for that purpose.

14       MR. HOWARD:  Your Honor, just one other point

15  building on counsel's comment about the relaxing of rules.

16       I know the Court is likely aware of this, but

17  Mr. DePuy fired Mr. Gault on August 20th, and it's now

18  almost a month later.  So this is not a traditional

19  situation of two days after something happens, the parties

20  are out trying to introduce evidence.  They've had a month

21  to try to get their ducks in a row.  In fact, you know, they

22  filed -- the original action was filed in California

23  August 24th, so I would ask --

24       THE COURT:  Okay.  I've got a question on that.  I'm

25  going to wait until the argument.  I think that will go to

1    the weight rather than the admissibility.

2         MR. HOWARD:  Thank you, sir.

3         THE COURT:  The objection -- again, it's admitted

4    only on the TRO, not on the personal jurisdiction.

5         BY MR. LUECK:

6    Q    What is your understanding that Mr. Gault visited

7    Biomet based upon?

8    A    Feedback from physician customers and sales

9    representatives.

10   Q    Mr. Howard raised the point that Bob Gault, Gault South

11   Bay, were terminated by DePuy.  Is that a true statement?

12   A    Yes.

13   Q    Why was Bob Gault terminated by DePuy?

14   A    A number of physician customers and sales

15   representatives brought information forward to me that he

16   was soliciting them to go to Biomet.

17   Q    And is that information the basis for the termination

18   of Mr. Gault?

19   A    Yes.

20   Q    What is that information that was brought to you?

21   A    That he -- his intention was to go --

22        MR. HOWARD:  Objection, Your Honor.  Lack of

23   foundation and, again, hearsay.

24        THE COURT:  Same ruling.  The objection is

25   overruled.

1   A    His intention was to go to Biomet and wanted to have

2   them go with him, the sales representatives and the

3   physician customers.

4        BY MR. LUECK:

5   Q    Who told you this?

6   A    Several physician customers and sales representatives.

7        MR. HOWARD:  Your Honor, if the Court please, can I

8   just have, rather than interrupt, a standing objection to

9   any hearsay with respect --

10       THE COURT:  As far as what he was told about what

11  Mr. Gault was doing?

12       MR. HOWARD:  Yes, sir.

13       THE COURT:  A continuing objection is permitted,

14  what he was doing in relation to Biomet.  I guess we may get

15  into another area, but the continuing objection is allowed.

16       MR. HOWARD:  Thank you.

17       MR. LUECK:  Your Honor, I would also just note for

18  the record that in response to Mr. Howard's hearsay

19  objection, part of the relevance for this evidence goes to

20  what the basis was for Mr. LaPoint acting as he did, so it

21  would not be hearsay in that respect.

22       THE COURT:  I understand.  We're running with about

23  three different levels here, and I'm grateful we don't have

24  a jury.

25

1          BY MR. LUECK:

2     Q     Mr. LaPoint, on a physician-by-physician basis -- and

3     if you wish not to use names, perhaps you can use the

4     facility at which the physician typically operates -- could

5     you provide me with information relating to what was told to

6     you by those physicians?

7              MR. HOWARD:  Excuse me, Your Honor.  Again, I hate

8     to keep interrupting.

9              But if he is going to relate a conversation, I

10    think, in fairness so that we know exactly what we're

11    speaking of, we should identify who the individual is that

12    supposedly made the comment versus an institution where

13    there may be 50 or 100 doctors, and I would ask that the

14    witness be directed to do so.

15             THE COURT:  As I understand it -- oh, yeah, I guess

16    we have gotten into that.

17             Do you wish to respond, Mr. Lueck?

18             MR. LUECK:  I don't believe we have any objection to

19    naming the names.

20             THE COURT:  Okay.  If you would, restate your

21    question then, please.

22             BY MR. LUECK:

23    Q     Mr. LaPoint, could you, please, proceed?

24    A     Dr. Steve Woolson from Stanford University called me

25    and told me that Bob wanted to take him back to Biomet and

1    develop a consulting relationship, design implants.

2           Dr. John Lannin had told me -- also from Stanford.

3    Excuse me -- that he was also told by Bob that he was going

4    to go to Biomet.

5           Dr. Ed Littlejohn in Los Gatos, California told me

6    that Bob had approached him on the same premise.

7           As well as Dr. Terrence Delaney, also from Los

8    Gatos.

9           Those were the physician customers.

10          The representatives are his entire sales group:

11   Craig Frey, Candice Polich; John Angileri; and Jake Daneman;

12   as well as Mike Olmes who's a senior rep to his adjacent

13   territory; as well as Eulis Haselden, a sales rep to his

14   adjacent territory.

15   Q    Were these individuals that you just mentioned all of

16   the people that are sales function within the Gault South

17   Bay organization?

18   A    Just the ones that worked for him, not Mike Olmes and

19   Eulis Haselden.

20   Q    What did these individuals tell you?

21   A    They told me that Bob was intending on going to Biomet

22   and converting the DePuy business to Biomet.

23   Q    Did you ultimately decide to terminate Mr. Gault?

24   A    Yes.

25   Q    When did you make that decision?

1    A    I believe around the 20th of August.

2    Q    Did Mr. Gault object to his termination?

3    A    I did not see him in person when he received the

4    document.  I'm not aware if he -- I believe he did.

5    Q    He did object?

6    A    No, I believe he did not object.

7    Q    What do you understand the term of the agreement to

8    have been if Mr. Gault had not been terminated for cause?

9    A    I'm sorry.  Repeat the question.

10   Q    Do you have any understanding of what the term of that

11   agreement, Exhibit A, would have been if Mr. Gault had not

12   been terminated for cause?

13   A    Well --

14        THE COURT:  You're asking how long the agreement

15   lasted?

16        BY MR. LUECK:

17   Q    How long would the agreement have lasted?

18   A    The agreement would have lasted through the end of the

19   year, the calendar year.

20   Q    Have you paid Gault South Bay and Mr. Gault all of the

21   commissions that are due and owing to them?

22   A    Yes.

23   Q    Have you complied with all of your obligations to Gault

24   South Bay and Gault as DePuy to your understanding?

25   A    Yes.

Page 28

```
 1    Q     Do you have any understanding of the action that

 2    Mr. Gault took or the reaction that Mr. Gault took to being

 3    terminated?

 4    A     I'm not.

 5    Q     Are you aware of whether Mr. Gault at any point brought

 6    a lawsuit against DePuy?

 7    A     I believe he did on the same day of his termination

 8    letter.

 9    Q     How did you become aware of that lawsuit?

10    A     Through my office.

11    Q     Who at your office?

12    A     Deanna Madge.

13          MR. HOWARD:  Objection, Your Honor.  Again, we'd

14    move to strike as hearsay.

15          THE COURT:  I don't think that would be.  I'll allow

16    it.

17          BY MR. LUECK:

18    Q     Do you have any understanding of whether Mr. Gault was

19    the only identified plaintiff in that lawsuit?

20    A     I believe his representative, Candice Polich, was also

21    listed on that.

22    Q     Who do you understand Ms. Polich to be?

23    A     She is a subrepresentative working for Bob Gault.

24    Q     Is she still working for Bob Gault today?

25    A     She is not.
```

1    Q    For whom is she working today?

2    A    She is contracted directly with DePuy.

3    Q    Do you know when she contracted with DePuy?

4    A    I believe about two weeks ago.

5    Q    What do you understand Mr. Gault to be doing today?

6    A    My understanding is he is working for Biomet.

7    Q    What's that understanding based on?

8    A    Him covering surgeries in hospitals that he previously

9    represented DePuy Orthopaedics.

10    Q    When did you receive information that he was covering

11    surgeries at hospitals formerly assigned to him by DePuy?

12    A    Last week.

13         MR. HOWARD:  Objection, if the Court please.  Lack

14    of foundation and hearsay.

15         THE COURT:  The objection is overruled on the

16    grounds previously stated.

17    A    Last week.

18         BY MR. LUECK:

19    Q    Understanding Mr. Howard's objection, but I will ask

20    the question, and understand it may be subject to the

21    objection.

22         Do you have any other information as to recent

23    activities of Mr. Gault?

24    A    He had a Biomet-sponsored physician meeting last week.

25         MR. HOWARD:  Objection, Your Honor.  Again, same

Page 30

1    objection.

2          THE COURT:  The objection is noted and overruled

3    pursuant to the earlier record.

4          BY MR. LUECK:

5    Q    What's the basis for that understanding as to --

6          THE COURT:  I'll allow you a continuing objection on

7    this line of questioning.

8          MR. HOWARD:  Thank you, sir.

9          BY MR. LUECK:

10   Q    What's the understanding for that -- what's the basis

11   for that understanding, Mr. LaPoint?

12   A    Feedback from physician customers that they actually

13   attended the dinner meeting.

14   Q    Mr. LaPoint, do you believe that DePuy has been harmed

15   by Mr. Gault's actions since he left DePuy?

16   A    I do.

17   Q    How has it been harmed?

18   A    From the standpoint of representatives seeking

19   additional monies, us having to rewrite those contracts, and

20   the reputation of our company.

21   Q    What do you mean by "reputation of our company"?

22   A    Defaming comments made by Bob Gault.

23   Q    What do you understand these comments to be or what do

24   you contend these comments to be?

25         MR. HOWARD:  Again, objection, Your Honor.  Lack of

Page 31

1    foundation and hearsay for yet another area of evidence.

2         THE COURT:  Same ruling as noted, and I'll allow a

3    continuing objection as to this line of questions as well.

4    A    Specific product, identifying product as having failing

5    issues, problems with clinical performance, unfound, as well

6    as a general position that Mr. Gault has regarding the

7    viability of DePuy as an organization and his discussion

8    about that with physician customers.

9         BY MR. LUECK:

10   Q    Mr. LaPoint, who were you retained or employed by

11   before you came to DePuy?

12   A    Biomet Orthopaedics.

13   Q    How long were you with Biomet?

14   A    Seven years.

15   Q    What position did you hold with them?

16   A    I was an independent distributor in Southern

17   California.

18   Q    Did you have a contract?

19   A    I did.

20   Q    Did that contract include a covenant not to compete?

21   A    Yes, it did.

22   Q    What was the term of that covenant not to compete?

23   A    Thirty days.

24   Q    Did you leave at any point from Biomet?

25   A    I did.

Page 32

1   Q     Did Biomet demand that you abide by your covenant?

2   A     Yes, they did.

3   Q     Did you abide by your covenant?

4   A     Yes, I did.

5   Q     Have you ever been engaged in any litigation with

6   Biomet?

7   A     Yes, I have.

8   Q     What was that?

9   A     I filed a lawsuit for commissions owed at the time of

10  my termination.  I filed that in the State of California.

11  Biomet filed a claim against me in the State of Indiana.

12  Q     Was that a separate lawsuit or something that was

13  transferred from California?

14  A     Transferred from California.

15  Q     What was the result of that lawsuit?

16  A     I settled in court, settled with them, and I paid out

17  what the judge had mediated.

18  Q     And was that a result of a lawsuit that started in

19  California or a result of a lawsuit that started in Indiana?

20  A     A result from the lawsuit that transferred from

21  California to Indiana.

22         MR. LUECK:  Okay.  I have no further questions.

23         THE COURT:  Thank you, sir.

24         Before I turn it over for Cross, let me just

25  clarify.

1          As I understand what you're saying, sir -- and I

2    don't want to put words in your mouth -- there was one

3    lawsuit; you filed it in California; it got transferred to

4    Indiana; and Biomet filed a counterclaim here; and that's

5    where it settled?

6          THE WITNESS:  That's correct.

7          THE COURT:  Okay.  Thank you, sir.

8          You may cross-examine.

9          MR. HOWARD:  Thank you, Your Honor.

10                    CROSS EXAMINATION

11    BY MR. HOWARD:

12    Q    Mr. LaPoint, the noncompete agreement that you had with

13    Biomet --

14    A    Yes.

15    Q    -- that had a form or venue selection clause in it,

16    didn't it?

17    A    A venue selection?  I'm not --

18    Q    In other words, that agreement stated that you must

19    file the lawsuit in Indiana, right?

20    A    I don't believe so.

21    Q    You don't believe so or do you know for sure one way or

22    the other?

23    A    I do not know for sure.

24    Q    Well, isn't it true that Biomet filed suit in Indiana

25    because there was a venue clause that said Indiana?

Page 34

```
 1   A     That could be.  I'm not --

 2   Q     And you filed suit in California, right?

 3   A     Yes.

 4   Q     And you filed suit in California even though there

 5   was -- there was a paragraph in the agreement that said that

 6   you're supposed to file in Indiana, right?

 7   A     I can't recollect.

 8   Q     Now, you were actually fired from Biomet, right?

 9   A     Yes.

10   Q     And as a result of the court proceedings, you were

11   required to pay Biomet money, correct?

12   A     Yes.

13   Q     You claimed that Mr. Gault had made some defamatory

14   comments about DePuy.  Do you remember that testimony?

15   A     Yes.

16   Q     When did you become aware of those alleged defamatory

17   comments?

18   A     The week -- I believe it was the -- August 18th or

19   19th, somewhere in that time frame.

20   Q     DePuy's filed a five-count complaint in this Court.

21   There's not a complaint or a count in that complaint about

22   defamation, is there?

23   A     I don't believe there is.

24   Q     You mentioned several doctors that supposedly told you

25   some information about Mr. Gault's conduct.  Do you remember
```

1    Drs. Woolson, Lannin, Delaney, and a few others, right?

2    A    Yes.

3    Q    Okay.  All of those doctors are in California, right?

4    A    That's correct.

5    Q    You also mentioned four or five individuals that you

6    say told you some things that Mr. Gault said to them,

7    correct?

8    A    Correct.

9    Q    And all of those individuals are in California, right?

10   A    Correct.

11   Q    You personally don't have an office in Warsaw, do you?

12   A    I do not.

13   Q    Isn't it true, Mr. LaPoint, that when DePuy would make

14   payments to Gault South Bay, Inc., those drafts or checks

15   were written out to Gault South Bay, Inc.?

16   A    Yes.

17        Can I add to that?

18   Q    No, you may not.  If your counsel would like to, sir,

19   you can go ahead later on.

20        You were also asked a question about whether you

21   asked Mr. Gault to sign the bottom of the last page of

22   Exhibit A.  Do you remember that question?

23   A    I do.

24   Q    And you actually at first said, "No," you did not, and

25   then you subsequently testified that, "Yes," you did.  Which

1    is correct?

2          Did you ask Mr. Gault to sign at the bottom of the

3    page or did you not ask him to sign at the bottom of that

4    page?

5          MR. LUECK:  Objection.  Mischaracterizes the

6    evidence.

7          THE COURT:  Hold to the question.  I'm going to

8    strike the preface to the question, because my memory is a

9    little different, but I'll allow the question itself.

10   A    Mr. Gault did sign the document.

11         BY MR. HOWARD:

12   Q    Mr. LaPoint, I was directing you to the bottom of the

13   last page of Exhibit A where you were asked the question as

14   to whether --

15         MR. HOWARD:  May I approach, Your Honor?

16         THE COURT:  Sure.

17         BY MR. HOWARD:

18   Q    -- as to whether he signed or not.

19         And my recollection -- and I may be wrong, but the

20   record will speak for itself -- is that first you said you

21   did not ask him.  Then you said you did ask him.

22         Your testimony now is that you did ask Mr. Gault to

23   sign at the bottom of the page?

24   A    I did not.

25   Q    You did not.

 1              I'd like you to take a look at the very first page

 2      of Exhibit A, sir.

 3      A      Okay.

 4      Q      That is the document that's dated November 22nd, 2006

 5      on the top left?

 6      A      Yes.

 7      Q      The name that appears in the top left of that document

 8      is Gault South Bay, Inc., correct?

 9      A      Correct.

10      Q      And on the top right is the name DePuy Orthopaedics,

11      Inc., correct?

12      A      Correct.

13      Q      The address that appears on the bottom of Page 1, that

14      is a California address, correct?

15      A      Correct.

16      Q      I'd like you to take a look at the very first paragraph

17      of the very first page.  There's a reference to the word

18      "contractor."  Do you see that?

19      A      I do.

20      Q      And the words that immediately precede the word

21      "contractor" are "Gault South Bay, Inc.," correct?

22      A      Correct.

23      Q      This document, Exhibit A, was drafted by DePuy,

24      correct?

25      A      Yes.

1    Q    Any of the customers -- strike that.

2          The customers that are listed on Exhibit B --

3    A    Yes.

4    Q    -- all of the entities listed on Exhibit B are located

5    in California, correct?

6    A    Correct.

7    Q    And the other entities that you referred to that are

8    not listed on Exhibit B are also in California, correct?

9    A    Correct.

10   Q    And you personally reside in California?

11   A    Correct.

12   Q    And your offices are indicated in California, correct?

13   A    Correct.

14   Q    You prepared an affidavit in this case, correct?

15   A    Yes, I did.

16   Q    And at the time that you prepared the affidavit, you

17   made sure that, before you signed it, it was accurate?

18   A    Yes.

19   Q    Did you type that affidavit up yourself?

20   A    I did not.

21        MR. HOWARD:  May I have one second, Your Honor?

22        THE COURT:  Uh-huh.

23                    (Discussion held off record.)

24        BY MR. HOWARD:

25   Q    Mr. LaPoint, you testified, in response to Mr. Lueck's

1    question about the length of your noncompete with Biomet.

2    It really wasn't 30 days; it was actually six months, wasn't

3    it?

4    A    I don't recollect.

5    Q    And that that noncompete only applied to you if you

6    quit Biomet, correct?

7    A    Again, I don't recollect.

8    Q    The addenda to the underlying agreement, Exhibit A --

9    and I believe it's identified as Exhibit C -- that document

10   was also prepared by DePuy?

11   A    Yes.

12   Q    Okay.  And in that document, there is a reference at

13   the top, again, to Gault South Bay?

14   A    Correct.

15   Q    And in Paragraphs 1 and 2, there is, again, a reference

16   to Gault South Bay, Inc. in Paragraph 1 and Gault South Bay,

17   Inc. in Paragraph 2, correct?

18   A    Correct.

19         MR. HOWARD:  Thank you.

20         THE COURT:  Thank you, sir.

21         Any Redirect, Mr. Lueck?

22         MR. LUECK:  Just one, Your Honor.

23                        REDIRECT EXAMINATION

24         BY MR. LUECK:

25   Q    Mr. LaPoint, on questioning from Mr. Howard, he asked,

1    I believe, the checks that were paid to this group, Gault or

2    Gault South Bay, to whom the checks were drawn, to whom the

3    checks were written to?

4    A    Yes.

5    Q    To whom were the checks written?

6    A    Bob Gault.

7    Q    Did you say previously Gault South Bay?

8    A    I would have to look into that.  I'm -- I am not sure

9    if it's Gault South Bay the checks were directly written to

10   or directly to Bob Gault.

11   Q    What would you need to do to confirm that?

12   A    Contact my office.

13          MR. LUECK:  No further questions.

14          THE COURT:  Thank you, sir.

15          Any Recross?

16                    RECROSS EXAMINATION

17       BY MR. HOWARD:

18   Q    Mr. LaPoint, you didn't bring any of those checks with

19   you today, did you?

20   A    No.

21   Q    But they would be in your office, correct?

22   A    No.  They're generated out of Warsaw, Indiana.

23   Q    And Warsaw is DePuy, correct?

24   A    Correct.

25          MR. HOWARD:  Thank you.

 1          THE COURT:  You may step down, Mr. LaPoint.  Thank

 2   you.

 3                          (Witness excused.)

 4          THE COURT:  I understand, with that, completes the

 5   evidence?

 6          MR. LUECK:  Yes, Your Honor.

 7          We do anticipate the filing of a declaration or

 8   affidavit from Candice Polich.  You may recall that she was

 9   identified as the subrep.

10          Due to her absence over the weekend, I believe that

11   that has just been sent to us and will be filed by the end

12   of the day.

13          That would be the only supplemental evidence beyond

14   what we have in the record presently that we would introduce

15   in support of our TRO.

16          THE COURT:  My ruling may precede it, so we'll have

17   to see.

18          Any evidence for the Defense?

19          MR. HOWARD:  No, Your Honor.

20          I don't know if the Court wants to entertain any

21   further arguments on any of the --

22          THE COURT:  Yeah, but let me invite -- since the

23   Plaintiff is the primary moving party -- and I understand

24   you have your own functions as well.  Let me invite the

25   Plaintiff to go first.

1          MR. LUECK:  Thank you, Your Honor.

2          Your Honor, in many respects, this is a classic

3    noncompete case.  There's evidence that an individual and

4    entity -- although there's argument on which.  I'll address

5    that momentarily.  But the covenant was signed.  A

6    termination took place, and the covenant has been violated.

7          Interestingly enough, there is no evidence

8    contradicting the evidence that there have been violative

9    acts since the departure of Mr. Gault.  There certainly

10   could have been a Gault declaration to that extent.  There

11   has been.

12         The evidence -- and we believe that it is

13   well-supported through the affidavits of Daneman.  The

14   affidavit of LaPoint and the testimony today is that despite

15   the obligation that Gault and Gault South Bay have not to

16   violate their obligations of noncompetition, they have done

17   so.

18         There is an issue that Mr. Howard is pressing very

19   strongly, that somehow Bob Gault is not party to this and is

20   not in any way bound by this.

21         Interestingly enough, if you relate back to the

22   California complaint that Gault, Gault South Bay, and

23   allegedly Ms. Polich signed, they explicitly identify Bob

24   Gault as the president and sole shareholder of Gault South

25   Bay and see a sufficient concern about whether he's covered

1    by that covenant to feel necessary not merely to bring that

2    lawsuit on behalf of Gault South Bay but also on behalf of

3    Bob Gault.  I would submit that Defendants' actions speak

4    more loudly than their words in terms of there being some

5    coverage.

6            THE COURT:  I lost you.

7            As I understand, you're saying that they're

8    concerned that DePuy might claim that the covenant covers

9    Mr. Gault rather than just the corporation, somehow is proof

10   that it does cover Mr. Gault rather?

11           MR. LUECK:  Well, it's certainly evidence that this

12   is not a closed question.  It is an open question that they

13   felt was a sufficiently open question to name both Gault and

14   Gault South Bay as parties to that in that complaint.

15           But more to the point, it is well established, and

16   it's particularly well established that under Indiana law

17   that parties cannot use subterfuge to avoid obligations of

18   noncompetition.

19           That goes back to the McCart versus McCart case,

20   which we've cited in our briefing, and the Norlund v Faust

21   case.  You can't use subterfuge to avoid a noncompete.

22           Here you have a situation where Bob Gault was the

23   sole shareholder, the president of this company, and he's

24   going out and competing.

25           THE COURT:  What is the subterfuge?

1    MR. LUECK:  The subterfuge is using the corporation

2  as a shell to avoid noncompete obligations but using it as

3  the benefit to get all of the benefits of the contract other

4  than the noncompete obligation, so they get the benefits,

5  but they don't have any of the weight and any of the

6  obligations because they can simply have Mr. Gault step out

7  from behind the shadow and violate the noncompete.

8    THE COURT:  What makes that different from a

9  shareholder of any other company?

10    MR. LUECK:  It makes it different in that what we

11  are seeking here is injunctive relief.  And even under the

12  terms of Rule 65, an injunction extends to those acting in

13  active concert and participation.

14    At this point, we've sought expedited discovery to

15  see whether the contract between Biomet and either Gault

16  South Bay or Gault exists.

17    I would, frankly, be surprised if it's not a

18  contract between Gault South Bay and Biomet and Mr. Gault

19  acting, again, on behalf of Gault South Bay.

20    But, in any event, to the extent that a

21  noncompete -- to the extent an injunction were extended to

22  Gault South Bay, we do believe that it would appropriately

23  extend to Mr. Gault as someone acting on behalf of that

24  entity.

25    We also note that the complaint alleges tortious

1    interference by Mr. Gault in causing the violations that are

2    alleged to have -- serve as the basis of the noncompete

3    violation and causes him to be a party acting in active

4    concert and participation.  Gault South Bay is acting

5    through Bob Gault when it violated its obligations under

6    this noncompete.

7         THE COURT:  How do I know -- how do I know that?

8         MR. LUECK:  You know that because Bob is the sole

9    shareholder and the president of the company.

10        THE COURT:  Are you, in essence -- I mean, you keep

11   coming back to that.  But my understanding is the corporate

12   veil would still suffice unless it's pierced somehow.

13        Are you contending that the corporate veil is

14   nonexistent, that it's pierced?  How do I know that

15   Mr. Gault treats the corporation as himself?

16        I guess I'm looking for those other things that I

17   usually see if somebody's telling me effectively that a

18   president/sole shareholder is the alter ego of the

19   corporation.  And so far, all I've got is Exhibit A and

20   Mr. Gault going around holding Biomet-sponsored physician

21   meetings.

22        How do I know that Gault equals Gault South Bay?

23        MR. LUECK:  Based on the ownership and the

24   activities, which we understand there's an issue, piercing

25   the corporate veil, and based on the fact that Gault South

1    Bay has these obligations.  And we expect that after

2    additional discovery, we'll establish that Gault South Bay

3    is the entity that is contracted and is bound by these

4    agreements, and the covenant should extend to both Gault and

5    Gault South Bay.

6              THE COURT:  Is there any evidence that I can look at

7    in this record -- as I understand, there's two potential

8    stumbling blocks for DePuy.

9              One is:  If Gault South Bay and Gault are separate

10   entities -- we know Gault South Bay signed Exhibit A -- is

11   there any evidence that Mr. Gault is subject to the same

12   noncompete -- any evidence that I can point to to say that

13   Mr. Gault is subject to the noncompete provision?

14             And secondly -- let me give you both of them because

15   I think it may not be the flip side of the coin -- if they

16   are separate entities, is there any evidence that Gault

17   South Bay rather than Robert Gault is -- let's see.  I'm

18   trying to figure out how to do this without characterizing

19   -- is engaged in conduct that would violate the covenant not

20   to compete?

21             Do you see my --

22             MR. LUECK:  No, I see your question, Your Honor.

23             And based on the limited record that we have -- by

24   the way, we have sought expedited discovery, and that motion

25   hasn't been ruled on.

1        THE COURT:  Oh, I understand.  I understand.

2        MR. LUECK:  Based on the evidence, we have today, as

3  to the first part of the question, we believe it is telling

4  in terms of the observation of corporate formalities that

5  the addendum to Exhibit A is not signed as Bob Gault,

6  president of the company.  It's signed simply as Robert

7  Gault.

8        THE COURT:  But that line, the line where he signed,

9  is representative, isn't it?  Isn't that what the line says

10 on Exhibit C, representative, representative's name?

11       MR. LUECK:  It does, but it does not identify him as

12 president, just representative's name, which in many

13 respects is equivalent to him individually as it is to the

14 company.  It doesn't define the company as representative

15 anywhere else in the document.

16       That is the evidence of overlap.  In terms of

17 evidence Gault South Bay acting improperly post-termination,

18 that is evidence -- the only evidence we have there is Bob

19 Gault who was the principal, the president, and the overlap

20 in that respect.

21       There is no dispute -- we believe the facts clearly

22 establish what Mr. Gault has been engaged in since then.

23       As for personal jurisdiction, there is evidence that

24 Mr. Gault has come to Indiana to further the business of

25 himself and Gault South Bay in bringing surgeons to the

1   state.  He has checks issued from the state.  He's had a

2   relationship with an Indiana corporation for in excess of 10

3   years.

4        And as a result, under the broad long-arm statutes

5   of Indiana, we believe that there is jurisdiction over

6   Mr. Gault, and that will be established as that issue is

7   further briefed.

8        Curiously enough, we did not hear any objection as

9   to personal jurisdiction until the hearing started this

10  afternoon.  The other papers that were filed on Friday made

11  no issue as to personal jurisdiction.

12       There have been many questions raised as to whether

13  this Court is the appropriate forum in which to proceed with

14  this litigation.

15       We believe that Biomet or Mr. Gault has prompted a

16  decision, at least on a preliminary basis, by the California

17  Court in that regard by seeking the temporary restraining

18  order it sought in California, and the California court,

19  after careful consideration and briefing, refused to enjoin

20  DePuy from pursuing this action.

21       We acknowledge that there may be motions, and we'll

22  be briefing in the future as to motions to dismiss, motions

23  to transfer, but the issue today before the Court is

24  determining whether a temporary restraining order is

25  important, is appropriate and determining whether there

1   should be a schedule put in place for expedited discovery

2   and other discovery that will allow us to present the Court

3   with a full record for a preliminary injunction hearing.

4          We acknowledge and in a brief that was filed just as

5   this hearing was starting that in determining whether --

6          THE COURT:  You filed a brief today?

7          MR. LUECK:  We did.

8          And, Your Honor, I will just mention it.  Or if your

9   Court wishes it, I won't mention it.

10         But the focus -- we believe the focus of this

11  hearing should be on the temporary restraining order.  There

12  may be some issues as to the choice of law that applies.  We

13  believe the choice of law is clearly Indiana law.

14         And even under California law, we believe that the

15  narrow exception rule that allows covenants to be enforced

16  in narrow exceptions when you're not preventing someone from

17  continuing employment would apply here.

18         As Mr. LaPoint testified, the listing of accounts on

19  Exhibit B is not even exhaustive of all of the hospital in

20  the Silicon Valley area.

21         So if Mr. Gault or Gault South Bay were to be

22  enjoined from serving those hospitals, Mr. Gault and Gault

23  South Bay could still pursue a career in promoting DePuy

24  Orthopaedic products.

25         So we believe that the evidence establishes a basis

1    for a temporary restraining order.  We ask that that order

2    be entered and that we proceed expeditiously to complete the

3    record so that we can have a full preliminary injunction

4    hearing.

5         THE COURT:  Okay.  I've got two questions.  One --

6    and the question that floats through at least the

7    Defendants' brief.  I don't know about the response brief,

8    but I'll get to that in a minute -- is that you should be

9    arguing all these things to Judge Ware in California.  And I

10   guess my question is:  Why a Northern Indiana case as

11   opposed to a counterclaim and 1404 petition before Judge

12   Ware in California Northern?

13        MR. LUECK:  Because a 1404 petition just buys the

14   Defendants in this case, Plaintiffs in that case, more time

15   to violate the noncompete.

16        We are raising this litigation in the forum that's

17   required by the contract that Mr. Gault signed, a forum that

18   has a connection to the dispute because DePuy Orthopaedics

19   is located in Warsaw, Indiana, in a situation that is not

20   unlike agreements between Biomet and its sales

21   representatives that require lawsuits to be brought in

22   Indiana.

23        We believe it's appropriately brought here.  We

24   believe that, after all of the parties have filed their

25   motions and cross motions to dismiss and transfer and

1    everything else, that the case will be brought here, and we

2    believe that because this is an appropriate forum, it is

3    appropriate for this Court, rather than the California

4    court, to be determining the issues of the temporary

5    restraining order and issues relating to the enforcement of

6    the noncompete.

7              THE COURT:   Thank you.

8              Mr. Howard.

9              MR. HOWARD:   Thank you, Judge.

10             May I speak from here, Your Honor?

11             THE COURT:   Sure.

12             MR. HOWARD:   Your Honor, I guess I'll start to work

13    backwards.

14             I think Your Honor raises a valid point about why no

15    counterclaim in the California court, why no 1404, et

16    cetera, and I think the reasons are quite clear as to why

17    that is the case.

18             Mr. Lueck's response that it makes no sense to do so

19    out in California because they're so concerned about

20    alleged violations of a noncompete by Gault South Bay really

21    doesn't fly, because that matter has been out there for four

22    weeks.

23             THE COURT:   Let me ask this.  When did they get -- I

24    know when the case was filed, and I know when they removed

25    it.  What I haven't learned is when they were served.

1           MR. HOWARD:  I believe that they were served six

2    days before they removed, Your Honor, because --

3           THE COURT:  It's not two weeks or four weeks.  It's

4    actually -- if they were served six days before they

5    removed, that would be September 4th, so they effectively

6    learned about that case, because I think your brief said,

7    you know, "This thing's been on file" -- "they waited two

8    weeks, and then they filed this suit."

9           MR. HOWARD:  Your Honor, they had knowledge of the

10   filing of the lawsuit immediately.

11          And in terms of when they actually filed their

12   petition for removal, I don't recall.

13          THE COURT:  The petition for removal was

14   September 10th.  I know that, and this case was filed

15   September 11th.

16          MR. HOWARD:  Right.

17          And I know that -- and I know that at a minimum, I

18   believe that there were four days left in the time frame for

19   their removal, so, you know, if that helps at all in terms

20   of the 10-day removal period.

21          So they have known about the case for at least two

22   weeks, assuming that the removal is the operative date.  My

23   information is -- and I have to apologize, because I'm just

24   into this at the very eleventh hour.

25          THE COURT:  Oh, I understand.

1          MR. HOWARD:  They were served almost immediately,

2    but --

3          THE COURT:  I want to say, with respect to both

4    sides, what I said as far as being able to marshal facts, I

5    know that applies to learning about the case as well.

6          MR. HOWARD:  Right.

7          And the point here is that -- I think there's a lot

8    to be said about the fact that counsel could have filed and

9    done something in California, and they haven't.

10         The interesting thing is that, on September 11th,

11   counsel from Barnes & Thornburg wrote a letter to California

12   counsel, Mr. Tory Griffin.  Mr. Tory Griffin works out of

13   Sacramento.  He's representing Gault South Bay.  And one of

14   Mr. Lueck's colleagues, Kendall Millard, wrote a letter

15   saying, quote:  DePuy intends to file a motion to dismiss,

16   transfer the action improperly filed in California.  But in

17   the meantime, DePuy's entitled to seek injunctive relief, et

18   cetera.

19         And Mr. Lueck stated that he thinks the correct

20   court here is here in Indiana.

21         Well, again, all of these things kind of interrelate

22   in terms of the propriety of a temporary restraining order,

23   the true emergency nature of things,  did they act properly,

24   did they act with clean hands.  They had ample time to do

25   something there and didn't.  Everything was set up there to

1    take some action.

2          All of the witnesses, as Mr. LaPoint testified, are

3    in California, much more facility to get that done there.

4          The other interesting thing --

5          THE COURT:  Let me -- let me clarify, because I want

6    to be sure that I'm on the same calendar page.

7          That case has been pending in the Northern District

8    of California for less than seven days; is that right?

9          MR. HOWARD:  No, sir.

10          THE COURT:  Seven days?

11          MR. HOWARD:  Well, the case was pending in the state

12    court --

13          THE COURT:  The Northern District of California.

14          You can't 1404 from the state court.

15          MR. HOWARD:  No, I understand that, sir.

16          It was -- there was original filing in the state

17    court.  And, unfortunately, the dates just escape me.

18          THE COURT:  I've got August 24th.

19          MR. HOWARD:  August 24, I believe, is correct.

20          And we received notice of the petition for removal,

21    I believe, perhaps, on the 9th or 10th, on the 10th of

22    September.

23          THE COURT:  The 10th is what I show having been

24    filed.

25          So it's been in the Northern District of California

1   and, therefore, subject to 1404 transfer.

2           MR. HOWARD:  Right.

3           And the other point, my understanding of the timing

4   here, Your Honor, I believe their answer would be due today

5   or their petition to transfer would be due today, which,

6   again, raises the specter of why everything is going the way

7   it's going.

8           And what I see here, what I think is happening here,

9   is forum shopping by the Plaintiffs in this case.

10          They make a bold statement, a conclusory

11  statement --

12          THE COURT:  Wasn't your guy forum shopping, too?

13          MR. HOWARD:  No, sir, I don't think he was.  I don't

14  think he was at all.  I can't --

15          THE COURT:  I'm not asking to look into your mind.

16          But when I look at it, you're telling me California

17  has this strong policy against covenants not to compete.

18  Your guy wants to be in California.  And I certainly

19  understand why.  A, he lives there.  And, B, the law favors

20  him.  And DePuy wants to be here.  A, they live here.  B,

21  their contract says, assuming the contract binds him, says

22  they're supposed to be here.  And, C, the law favors them

23  more than California at least.

24          So, I mean, it strikes me that everybody's forum

25  shopping.

1          MR. HOWARD:  Well, the difference here, Your Honor,

2     is this:  That everything that is involved in this case,

3     everything, other than possibly the source of the checks --

4     and I'm not even sure that that's true -- is in California.

5          The fact that -- you know, counsel made a comment

6     about, "Well, Mr. Gault was a party as a plaintiff to the

7     underlying suit."

8          Well, the point was, of course, of a declaratory

9     judgment action is to make sure that there's a definition as

10    to whom is bound by what.

11         THE COURT:  You don't have to address that one.   I

12    understand.

13         MR. HOWARD:  Fair enough.

14         But the issue here, too, with respect to the

15    location is, Mr. Gault has nothing to do with this location.

16    And even the complaint and the pleadings that were filed by

17    the Plaintiffs demonstrate that Mr. Gault doesn't belong

18    here.  They have no jurisdiction, because it's a conclusory

19    allegation.

20         They make a blanket statement with respect to venue

21    that 1391(a)(2) applies.

22         1391(a)(2) says; A substantial part of the events or

23    omissions giving rise to the claim must occur in this forum.

24         That's not the case here.  So, again, we're left

25    with the situation of absolutely nothing happening here in

1     Indiana.

2               Let me move to another point about Mr. Gault.

3               And, again, I just referred now to the pleadings

4     that were filed by DePuy in this case.

5               Count 3 of the complaint is a -- I believe it's

6     Count 3 -- is a claim for, yes, tortious interference with

7     contract, and the claim is by DePuy against Mr. Gault for

8     the contract between DePuy and Gault South Bay.

9               It's axiomatic that you cannot interfere with your

10    own contract.  We have a judicial admission by DePuy that

11    Mr. Gault is not a party to that contract.  It's as clear as

12    day.  I turn the tables and --

13              THE COURT:  Can't they plead in the alternative?

14              MR. HOWARD:  It's not pled in the alternative.  It's

15    not pled in the alternative.  It's pled as a tortious

16    interference against Mr. Gault with the contract between GSB

17    and Gault South Bay.

18              THE COURT:  Don't they also allege in -- I can't

19    remember whether it's Count 1 or 2.  I can dig out the

20    contract.  But 1 or 2, don't they allege that he's a party

21    in breaching the covenant not to compete?

22              MR. HOWARD:  Actually, Count 1, Your Honor, in

23    Paragraph 28, they say:  Gault South Bay entered into the

24    contract.

25              And in Paragraph 30, they say:  Gault South Bay

1    violated the noncompete.

2        In Count 2 -- actually, Count 2 is the tortious

3    inference with contract.

4        MR. PALMER:  (Indicating.)

5        MR. HOWARD:  Right.

6        And Mr. Palmer points out to me as well, Your Honor,

7    that Count 1, under the heading in parentheticals says,

8    quote:  Directed to Gault South Bay.

9        So if you look at the heading, you look at Paragraph

10   28, Paragraph 30, they all state specifically that it's

11   Gault South Bay that violated the agreement.

12       And in Paragraph 34 of Count 2, Your Honor, they

13   say:  Gault was aware of the contract between Gault South

14   Bay and DePuy and that Gault interfered -- this is Paragraph

15   36 -- with these agreements.

16       Taking matters even further and making this

17   situation even worse on DePuy's end is that they rely on

18   Paragraphs 19 and 20 of the preliminary allegations for

19   these alleged violations or these alleged improper conduct

20   or items of improper conduct by Mr. Gault.

21       Paragraph 19 and 20 are both based on information

22   and belief.

23       The standard is clear.  There has to be clear

24   showing of a violation.  Information and belief is not a

25   clear showing.  The hearsay upon hearsay that we heard from

1    Mr. LaPoint is not a clear showing.

2          So I digress, but back to the original point.

3    Counsel in DePuy's own pleadings show and prove that Robert

4    Gault is not a proper defendant here, and there's been no

5    evidence to demonstrate that he's availed himself of this

6    jurisdiction or that he did any business here.

7          And this vague general allegation or reference, I

8    should say, to the long-arm statute, there's been no

9    evidence here of any information that would meet the

10    requirements of the long-arm statute under Indiana law.

11          If I may just continue on, again, backwards with

12    comments by counsel in his closing discussion.

13          Mr. Lueck specifically said -- I'd like the Court to

14    focus on the TRO.  I think that's, according to their

15    pleading, what we're here to do.  But I think if we focus on

16    the TRO, one of the first things that has to be addressed,

17    which, again, is very indicative of the things that are

18    going on here, is the likelihood of success on the merits.

19          I believe that California law would apply even if

20    the Court was to decide the matter -- this Court was to

21    decide the matter.

22          Under California law, this noncompete is

23    unenforceable.  It's overly broad.  It includes Johnson &

24    Johnson which is the parent company of DePuy.  It basically

25    would preclude Gault South Bay from even selling Band-Aids

Page 60

1    or ear swabs, even though he never participated in that.

2            THE COURT:  Help me out with that, because I noticed

3    your -- on Page 19 of your brief, it says:  The noncompete

4    agreement broadly defines competitive activities as, quote,

5    selling, offering for sale, promoting, receiving, or

6    soliciting order for goods or services similar or intended

7    for similar use as those offered by DePuy or any other J & J

8    Company.

9            And I gather that's what you're referring to?

10           MR. HOWARD:  Yes, sir.

11           THE COURT:  I can't find that in the noncompete

12   provision.  I must be looking in the wrong place.  But I've

13   got Exhibit A here, and I just can't find that.  Can you

14   help me find where you --

15           MR. HOWARD:  Yes, Your Honor.  I'm going to try and

16   find it for you real quick.

17           Your Honor, I can't put my hands on it at the

18   moment, but Mr. Palmer will continue to search so I can

19   cover the rest of the topics.

20           THE COURT:  All right.

21           MR. HOWARD:  But backing up to the likelihood of

22   success.

23           With respect to Mr. Gault, again, as Your Honor

24   mentioned at the very beginning of the discussion, there is

25   an issue as to the likelihood of success against Mr. Gault

1    based on the fact that he's not a party to the agreement.

2         With respect to Gault South Bay or GSB to save a few

3    syllables, we do believe that it is overbroad, and we do

4    believe that California law as set forth in our brief would

5    not support the enforcement of it.

6         And even if the case were to proceed here, which by

7    these arguments we're not saying that it should because of

8    our prior position, we think that, if California law were

9    applied, it would be held to be unforcible, and Plaintiffs

10   would not be likely to succeed on the merits.

11        As far as the other elements that are required, that

12   DePuy is required to prove and demonstrate by a clear

13   showing, they have to prove that they have no adequate

14   remedy at law.

15        Well, everything I heard from Mr. LaPoint, including

16   the alleged defamation, is recoverable by money damages.

17   Any alleged lost business and lost sales that they've

18   referred to is also something that could be recovered from

19   money damages, assuming anything that they said is true.

20        The protectable interest element.  Mr. LaPoint

21   testified that, with respect to Exhibit B, the list of

22   entities with whom Gault South Bay had done business, he had

23   said that those entities had done business with Mr. Gault

24   before he ever even created Gault South Bay.

25        So the interest here one would see as Mr. Gault's is

Page 62

1    the fact that he was the one that brought those entities

2    into Gault South Bay to do business with DePuy.  That's

3    another element that fails.

4         There's an issue of whether there's any emergency

5    here for a TRO.

6         Again, August 20th is when Mr. LaPoint testified

7    that GSB's relationship ended with DePuy.

8         They claim in their pleadings at Paragraph 23 that

9    the relationship between Gault and Biomet started

10   September 4th, so we're at least two weeks after the fact

11   that they knew that this had happened or they were aware

12   that this had happened, that now they're coming into this

13   Court and trying to take some action, so, again, I don't

14   think there's an emergency that would require the entry of a

15   TRO.

16        And one other issue with respect to where this

17   matter should or should not proceed.

18        We referenced in our brief the fact that -- and this

19   supports the forum-shopping argument that I mentioned before

20   -- that DePuy actually has filed a lawsuit in Kosciusko

21   County with respect to a relationship that they had in New

22   Jersey.

23        I'm sorry.  With respect to a contract that they had

24   where the forum-selection clause was New Jersey.

25        So I think you'll see even by that document, which

1    we would ask the Court to take judicial notice.  It's an

2    exhibit to our pleading -- that DePuy is filing actions

3    where it sees fit or where it sees its advantage versus --

4              THE COURT:  That one I need to ask you about.

5              They file in Kosciusko or -- they file in Kosciusko

6    or say in Kosciusko County that a given forum-selection

7    clause is unforcible or it doesn't apply.

8              That means that they're estopped from ever relying

9    on a forum -- I don't understand how we get from Point A to

10   Point B, and I'm not sure what Point B is.

11             MR. HOWARD:  Right.  You asked me -- right.  In my

12   first discussion, I was mentioning forum shopping, and you

13   made the comment with respect to, "Well, isn't that

14   happening in California?  Isn't that happening here?"

15             We only have one instance upon which to rely with

16   respect to Gault South Bay or Mr. Gault, and that's their

17   issue in their case in California.

18             In the DePuy versus Zimmer and Los case, which,

19   again, is referenced in our pleadings, there was a forum

20   clause in New Jersey, but they still filed suit here in

21   Indiana.

22             So, again, it's a situation where who is making

23   decisions about strategic or tactical advantage and forum

24   shopping.  I think we have a trend or pattern here that I'm

25   trying to reference in terms of what DePuy is doing.

1          I think that there is a reasonable and logical

2     solution here, and I think that it is something that DePuy

3     should not really object to because it's what they

4     themselves have said in their September 11 letter that they

5     were going to do.  The logical solution here is -- because

6     there's an absence of evidence.  There's no clear showing.

7     They're not likely to succeed on their merits.  The balance

8     of harm does not weigh in their favor.  They haven't

9     satisfied any of the elements with respect to specific

10    evidence to support the extraordinary remedy of the TRO.

11    They have stated the intention to go file something in

12    California, to say, "No, no, no.  This is the wrong forum.

13    It should be transferred."

14         We would respectfully suggest that that's what they

15    ought to do.  They could have spent the time that we were

16    here doing that.  Perhaps it would be the more prudent use

17    of time.

18         I would suggest to the Court that no order be

19    entered today, the matter be stayed pending their stated

20    desire and intent to file something in California with

21    respect to a transfer.

22         And I want to go off on a tangent for just one

23    second.  It's interesting that DePuy has elected to follow

24    and use the Rules of Civil Procedure when it suits them --

25    case filed in state court, removed to federal court -- but

1   they don't follow the Rules of Civil Procedure with respect

2   to asking for a transfer or asking for the ability to file a

3   counterclaim or just filing a counterclaim in that court.

4         So, again, I'm not -- I guess I'm trying to

5   establish here that there is a pattern of what's going on

6   here.

7         I think the fair thing here is to do exactly what

8   they said they're going to do; stay these proceedings and

9   ask them to file -- order them to file the appropriate

10   motions in the California state court so that we can have

11   that addressed in the appropriate time.

12         And, Your Honor, my colleague here has pointed out,

13   Mr. Palmer has pointed out, that at the very bottom of Page

14   1 -- this goes back to your question about Johnson &

15   Johnson.  The very last sentence, it states, quote:

16   Competitive activities means -- and I think it's a typo or I

17   guess it's not.  Competitive activities means selling,

18   offering for sale, et cetera, et cetera, offered by DePuy or

19   other J & J company, et cetera, et cetera.

20         So that's the reference to --

21         THE COURT:  How does that tie back then to the

22   noncompete provision on Pages 7 and 8?

23         MR. HOWARD:  Because the noncompete provision

24   references competitive activities.  They define competing

25   activities on Page 1.

1          And I apologize it took us a while to find that.  My

2     error.

3          So that would be the practical solution here.  I

4     don't think that.  Given the time that's passed and given

5     the absence of competent evidence, nonhearsay admissible

6     evidence, that there's any harm in that occurring.  And as I

7     said, based on my calendar -- and I may be wrong -- I think

8     that would be today that they would have to file something

9     along those lines.

10          If the case were to proceed, and even if the case

11     were to come back here at some point, I think that what we

12     will likely do, given the exigencies and the circumstances

13     of the witnesses and the documents and everything else, I

14     think a forum nonconvenience motion would still proceed at

15     that point so that we could address these issues.

16          I only mention that for this reason.  If reality

17     were different and the case was originally filed here, there

18     very likely would be a forum nonconvenience motion that

19     would be filed, because everything else is out in

20     California.  You have an individual who's fighting this

21     company.  You have witnesses, eight or nine witnesses that

22     were identified by Mr. LaPoint.

23          And, again, that perhaps is a bit moot at this

24     point, if you will.  But if the situation were reversed, we

25     may have the very same circumstances.

1      Why is it important?  It's important because I think

2  we should have this matter stayed at this time; have the

3  appropriate pleadings filed based upon counsel's own stated

4  intention in California; let the California court ferret it

5  out; and we see where we end up at that point.

6      On a substantive level, I simply don't see the

7  evidence to support a TRO.  They asked for expedited

8  discovery.  So be it.  They still have to make a showing, a

9  preliminary showing, that there is something going on here

10  and enough evidence to support the entry of a TRO, and I

11  don't think they've satisfied that, Your Honor.

12      THE COURT:  Thank you, Mr. Howard.

13      Mr. Lueck, the right to close.

14      MR. LUECK:  Thank you, Your Honor.

15      Mr. Howard identifies these lawsuits that involve

16  employees rather than independent contractors of DePuy who

17  have agreements that are different from the agreements at

18  issue here, forum selection clauses that are different from

19  the forum selection clauses here.

20      THE COURT:  You don't have to address that.

21      MR. LUECK:  Okay.  I think the E-Z Dun case, which

22  is -- the opinion of which was attached to Kendall Millard's

23  affidavit is the more telling here.  That has a

24  forum-selection clause.  It was a dispute involving a

25  terminated distributor suing DePuy in California.

1    THE COURT:  I don't know whether that's similar to

2  this one either.

3    MR. LUECK:  Well, I think that --

4    THE COURT:  I have no reason to think it's any more

5  similar than the one they're talking about.

6    MR. LUECK:  Certainly, Your Honor.

7    The idea that DePuy is acting improperly is not

8  something that's borne out by the record.

9    This is the Court in which this lawsuit belongs.

10  It's the Court in which the parties agreed to have the

11  lawsuit resolved.  It's the Court that is the Court located

12  where DePuy Orthopaedics is located.

13    There's no malfeasance going on here.  What there is

14  is a desire to get relief.

15    We heard the testimony of Mr. LaPoint regarding

16  evening meetings with doctors and the other activities that

17  create the irreparable harm that cannot be remedied merely

18  by money damages.

19    Rather than go with the court that is not going to

20  keep the case, we believe, in California, we've come to the

21  Court that should keep the case.  We're seeking the TRO, and

22  we're seeking the expedited discovery to move this to a

23  preliminary injunction stage.

24    There is no adequate remedy at law.  That's well

25  established by the cases in Indiana as to these activities

1    in the noncompete context.

2          And Mr. Gault is an appropriate party here.  Here is

3    the tortious interferer who is causing Gault South Bay to

4    act improperly.  And for those reasons, an injunction

5    should -- a TRO should enter, and expedited discovery should

6    go forward to conclude this dispute and get the preliminary

7    injunction in place.

8          Thank you.

9          THE COURT:  Thank you, sir.

10         I need to begin with the matter of personal

11   jurisdiction, and I think I have to apply a quick-glance

12   type of standard to the evidence, because we have a motion

13   that, as far as I can tell, was made an hour-and-a-half ago

14   with no opportunity to prepare a response.

15         On the other hand, obviously, I cannot issue a

16   temporary restraining order without at least glancing at the

17   matter of personal jurisdiction to be sure that there is

18   some basis on which to say that all parties being enjoined

19   are properly before the Court and that the Court has the

20   authority to do it.

21         And I think, based on that standard, which is really

22   all I can do since I really have very little in the way of

23   evidence, the evidence that I do have is that Mr. Gault

24   signed the agreement.  Whether he did so as president solely

25   or individual capacity, he signed the agreement, so I think

1    he's tied to the agreement for specific jurisdiction

2    purposes, and there is evidence that he came to Indiana at

3    least once as a DePuy representative to allow physician

4    tours of the plant.  And, accordingly, while there may not

5    be general jurisdiction for a California resident,

6    California citizen, I think there is at least what appears

7    to be, since I have no evidence to the contrary from the

8    Plaintiff -- I mean from the Defense -- what appears to be

9    sufficient for a showing of specific jurisdiction over

10   Mr. Gault.

11        I say that without prejudice to a motion -- an

12   ultimate motion to dismiss for personal jurisdiction.

13        I think we all understand that we're in a hurry-up

14   mode.  Whether we're moving as fast as we might have if we

15   did it last week or faster than we would have if we did it

16   later this week, we're still in a hurry-up mode.  There is

17   still much to be learned by both sides and a great deal to

18   be learned by me and perhaps a great deal to be learned by

19   Judge Ware.  I don't know.

20        In any event, I will not dismiss at this point on

21   personal jurisdiction grounds.  Again, this is without

22   jurisdiction -- or without prejudice to an ultimate motion

23   for -- written motion to dismiss for lack of personal

24   jurisdiction, but I will not dismiss or defer ruling on the

25   TRO for that purpose.

1          To be entitled to a TRO, a plaintiff must make the

2     same type of showing as must be made for a preliminary

3     injunction, although it's done with a little softer gaze at

4     the evidence, understanding nobody's really had a chance to

5     marshal their resources yet.  But a party seeking a TRO must

6     show a reasonable likelihood of success on the merits, which

7     in this circuit means better than negligible.  The Plaintiff

8     must show or the movant must show that it is suffering

9     irreparable harm that outweighs any harm the Defendants will

10    suffer if the injunction is granted, and it's later

11    determined to be an error, that there is no adequate remedy

12    at law, and that an injunction would not harm the public

13    interest.

14          And based on today's submission -- and I recognize,

15    as I said in response to Mr. Lueck, that this all may change

16    by the time of the preliminary injunction.  I'm ruling

17    simply on what I have here -- there is not evidence that

18    demonstrates a better than negligible likelihood of success

19    on the merits.

20          I don't think there is sufficient evidence that I

21    could find that Mr. Gault has used the corporation as his

22    alter ego or to pierce the corporate veil.  Mr. Gault signed

23    the agreement in a representative capacity and signed the

24    addendum to the agreement in a representative capacity.

25          And I do agree, having looked at the complaint --

1   and I'm a bit confused, and I meant to ask Mr. Lueck this in

2   his rebuttal argument.  The motion or the brief in support

3   of the motion -- and, again, I recognize we do these things

4   hurriedly, but it says:  The Defendants have breached -- and

5   that's plural -- have breached the noncompetition

6   obligations of the Gault agreement, and I can't -- like the

7   Defendants, I cannot find a claim against Mr. Gault for

8   breaching the noncompetition obligation, so I'm not sure on

9   what claim the Plaintiff would be likely to prevail if they

10  showed that Mr. Gault was a party, but that's -- I don't

11  turn on that which is something we're going to need to -- if

12  we get to the temporary injunction hearing, that's something

13  I'll be asking about.

14          And I don't think there's any evidence that Gault

15  South Bay itself, the contracting party, is violating the

16  noncompete agreement.  And unless Mr. Gault is actually

17  causing Gault South Bay to breach the agreement -- and,

18  again, on the basis of this record, I can't find that he is.

19  Maybe he is.  Maybe there will be evidence of that at the

20  temporary injunction hearing, but there isn't now.  I don't

21  think that I can find that he is tortiously interfering.

22          And, accordingly, because of that, I will deny the

23  temporary restraining order, understanding -- and I probably

24  have said this too many times already but one more time --

25  things may be different at the temporary injunction hearing.

1          We have a couple of things that we need to address.

2     One is the shortened discovery schedule, and I would propose

3     that we march ahead with that.  I would propose to provide

4     that the discovery would apply in both cases, any discovery

5     you do in this case apply in that and vice versa, because it

6     does appear we've got overlapping issues, and I'll talk to

7     you in a moment about how much time.

8          We do have a motion to dismiss.  And, Mr. Howard,

9     the District Rules -- and, again, I know everybody is moving

10    quickly, but the District Rules say that every motion has to

11    be separate and supported by a brief.

12         I read the motion which, of course, combines the

13    brief and combines about three different motions because we

14    had the TRO hearing.

15         I'm going to go ahead and deny it for failure to

16    comply, allowing you to refile, and I don't do that just for

17    the sake of formality.  But your motion to transfer, I

18    think, is a significant issue.  And I know you were trying

19    to address everything in a very short time, so I don't know

20    whether you're going under 1404 or 1406 or how you're

21    analyzing those.  And before I ask the Plaintiff to respond,

22    I think we need to know.

23         MR. HOWARD:  Fair enough.

24         THE COURT:  And I understand you may want to raise

25    the personal jurisdiction, too, so I will deny that motion

Page 74

1    without prejudice to its being refiled in compliance with

2    the District Rules.

3            And I think we ought to go ahead and set a temporary

4    injunction hearing, understanding that by the time we get to

5    that, either Judge Ware or I will likely have ruled on a

6    motion to transfer.  But just in case, it's here, it seems

7    as though we ought to be not having to call each other with

8    calendars and that sort of thing.

9            So let me start, Mr. Lueck, with you.  You asked for

10   the shortened discovery schedule.  What sort of time frame

11   do you seek to -- and I gather you want deposition of the

12   defendants, and I gather they may want a deposition or two,

13   and you want some written discovery.  How much time do you

14   think will be needed to complete that?

15           MR. LUECK:  Probably to get it altogether and have

16   additional briefing to the Court would take three weeks,

17   possibly four weeks.

18           THE COURT:  Okay.  Does that sound workable from

19   your standpoint, Mr. Howard?

20           MR. HOWARD:  We'll do our best, yes, sir.

21           THE COURT:  Okay.  So run it out 30 days then for

22   discovery.

23           What motions do you contemplate filing out of the, I

24   guess two potential ones, the dismissal and the transfer

25   motion, and how soon do you think you can get them on file?

1        Again, I don't want to see everybody spinning their

2   wheels preparing for an injunction hearing only to shift the

3   case to -- I can't remember whether Judge Ware's San Jose,

4   Oakland, or San Francisco.  I should know that -- but

5   whichever he's in.  And I'm not tipping a hand, because I

6   have no idea.  But I don't want to see anybody waste time

7   preparing for one hearing, only to move halfway, two-thirds

8   of the away across the country.

9        MR. HOWARD:  Your Honor, I would endeavor to file

10  the correctly segregated motions by week's end.

11       THE COURT:  Okay.  So by Friday.  That would be the

12  22nd.

13       And I gather you want to respond quickly so that we

14  can get it done?

15       MR. LUECK:  Yes, Your Honor.

16       THE COURT:  Would the following Friday be enough or

17  you would want until the Monday after that?

18       MR. LUECK:  Yes, I think we could do it by the

19  following Friday.

20       THE COURT:  Okay.  So 9/28 for response.

21       MR. HOWARD:  I'm sorry.  I just realized that this

22  Friday I have another substantial brief due.  And if I could

23  possibly get until Monday, that would be very helpful.

24       THE COURT:  Okay.  So 9/24 and then kick it over to

25  10/1 for your response.

1        MR. LUECK:  The following Monday.

2        THE COURT:  And can we go, say, to the following

3    Thursday for any reply.  You don't have to file a reply.

4    But if you want to, you'll have a few days to do it.

5        MR. HOWARD:  That's fine.  Thank you, Your Honor.

6        THE COURT:  Okay.  Thirty days from now, if this is

7    the 17th, would be, I guess, the 17th of October, so I guess

8    we'd be looking -- and that 9/29 would be for any 12(b)(2)

9    motion or motion for transfer under Section 1404 or 1406 of

10   Title 28.

11       Now comes the tough question, because you folks have

12   not gotten involved in discovery, and I gather you haven't

13   been the principal folks out in California.  If we do have a

14   hearing here, how long a hearing are we talking about?  I

15   mean, it sounds as though a day should be sufficient, but I

16   don't know.

17       MR. LUECK:  A long day.

18       MR. HOWARD:  Very hard to say, but, again, we'll do

19   our best to finish in a day, if that's at all possible.

20       THE COURT:  Let me see what we've got here.

21       MR. HOWARD:  Actually, you know, Your Honor, given

22   the logistics, if it does proceed here, there would be

23   people traveling from California.

24       THE COURT:  Right.

25       MR. HOWARD:  It may make sense, for purposes of your

1    calendar, to maybe look at two days in case there's a

2    logistics issue for somebody getting here.

3              THE COURT:  Well, what I was thinking, maybe start a

4    Thursday afternoon and then, hopefully, have most of Friday.

5    Although, I've got to warn you.  If we go into a game day,

6    they have a tough time getting out of town.

7              MR. HOWARD:  Understood.  I guess they'll just have

8    to get tickets.

9              MR. PALMER:  That shouldn't be difficult this year,

10   Your Honor.

11             THE COURT:  Yeah, that's increasingly easy.

12             Well, I've got two other preliminary injunctions the

13   week of October 29th.  How would you look for November 1st?

14             MR. HOWARD:  What day of the week is that, Your

15   Honor?

16             THE COURT:  That's a Thursday, and we could do that

17   Thursday/Friday, combination.  I don't know the Notre Dame

18   schedule.  I don't pay enough attention to know whether

19   there's a game November 3rd.

20             MR. LUECK:  Your Honor, I have a hearing on another

21   matter scheduled for Federal Court in St. Louis, Wednesday

22   morning, the 31st, and that is Halloween evening.  It would

23   be difficult for me to have witnesses together and ready for

24   a hearing starting the 1st.

25             THE COURT:  Okay.

1          MR. LUECK:  I hate to go into the following week,

2     but would that be a possibility?

3          THE COURT:  It's more challenging.  We've got three

4     criminal cases set that Monday, and that isn't a problem the

5     week before.  Nobody's been going to trial.  But on the

6     other hand, as you know, they get the courtroom if they need

7     it.  But I can give you a Tuesday/Wednesday combination that

8     week, November 6th and 7th.

9          MR. LUECK:  Okay.  That would be better for us.

10         MR. HOWARD:  Your Honor, some familiarity with the

11    physicians' and surgeons' schedules, my understanding

12    historically is that they're extremely busy in the beginning

13    of the week and that a Thursday/Friday would work much

14    better.

15         Is that true, Brad?

16         MR. LaPOINT:  Yes, it is.

17         MR. HOWARD:  I don't mean to ask you directly, but

18    that's my understanding.

19         THE COURT:  I can't give you that Thursday, and

20    we've got a ton of sentencings set that Friday.  We've got a

21    judge sidelined, and I'm taking all his sentencings.

22         So I could go to the following week.  I hate to keep

23    moving it further down, but the 15th and 16th.  Again, we've

24    got criminal cases early in the week, but I'm not going to

25    be able to avoid that.

Page 79

1          MR. LUECK:  That would be acceptable.

2          THE COURT:  The 15th/16th combination?

3          MR. HOWARD:  Yes, sir.

4          THE COURT:  Okay.  Do you want to do that 1:30 start

5    or would you rather start in the morning and hope we can get

6    some folks on and off in the morning?

7          MR. LUECK:  I really don't have any strong

8    preference one way or the other.

9          MR. HOWARD:  I think the early afternoon start would

10   probably be fine in case there are problems with people

11   getting in.  It would probably help on that morning.

12         THE COURT:  Okay.  All right.  07-CV-425, 1.5 day

13   preliminary injunction.

14         That covers everything on my agenda other than -- I

15   guess, again, I don't know what Judge Ware's thinking.  He

16   may set the same kind of schedule and see what happens with

17   the motion to transfer.  And I don't have a written ruling

18   obviously to e-mail to California Northern.  Can I rely on

19   folks to get word to the Judge what happened here today?

20         MR. HOWARD:  Yes, sir.

21         MR. LUECK:  We'll communicate.

22         THE COURT:  Okay.  Anything else then for Plaintiff?

23         MR. LUECK:  No, Your Honor.

24         THE COURT:  Or for Defense?

25         MR. HOWARD:  No, sir.

1                  THE COURT:  Okay.  See you all in November.

2                  MS. LINDER:  All rise.

3                                      (Proceedings concluded.)

4                                 * * *

5                            CERTIFICATE

6          I, DEBRA J. BONK, certify that the foregoing is a

7     correct transcript from the record of proceedings in the

8     above-entitled matter.

9                            _____

10                           DEBRA J. BONK, RMR, CRR
                             UNITED STATES COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25